[Crim. No. 11895.    Second Dist., Div. One.    July 24, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. LEANDER BLEDSOE, Defendant and Appellant.

Belan M. Wagner, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and David N. Rakov, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction for murder in the first degree and from an order denying a motion for new trial. Defendant was found guilty by jury verdict, his motion for new trial was denied, he waived jury trial on the penalty and was sentenced by the court to life imprisonment.

The evidence discloses that on the evening of December 3, 1964, Lee Harris visited the 1044 Club in Long Beach with friends, left the bar at around 10 p.m., and was shot shortly thereafter on the sidewalk outside the club. The shotgun wound which caused Harris' death created a pattern of wide pellet dispersion across his chest and abdomen which could have been made only by a standard .12 gauge shotgun from about 39 feet or a sawed-off gun at relatively close range.

Mrs. Elizabeth Ricks, who operated "Mom's Pit Barbecue" across the street from the 1044 Club, testified that she was standing in the large bay window store front shortly after 10 p.m. when she saw Bledsoe leave the 1044 Club. Harris came outside five to ten minutes later. Bledsoe soon reappeared carrying an object about 2 feet long which to her appeared to be a club or a rifle. He approached and finally raised the object when he was only about 4 or 5 feet from Harris. There was the sound of a shot and Harris slumped to the sidewalk crying for help while Bledsoe disappeared down the street from whence he came.

Later that same evening Officer Robertson learned that a homicide had occurred and visited the scene. Harris' body already had been removed, but Mrs. Ricks told him that the crime was committed by a man known to her only as the boyfriend or husband of Gladys da Veiga. Officer Robertson knew both Gladys and Bledsoe, whom Gladys earlier had identified to him as her boyfriend, and had seen Bledsoe in apartment 4 at 1065 East 19th Street in Long Beach the day preceding the murder. Officer Robertson knew Bledsoe as a suspect in numerous robberies wherein the robber had been armed with a shotgun; he was informed that the weapon in this instance was a shotgun, and only three weeks earlier he had entered Bledsoe's apartment with a search warrant to find the weapon used in an attempted murder. With this information in mind, Officer Robertson went immediately to the subject apartment in the company of other officers looking for Bledsoe. They arrived about 11:30 p.m. without a search warrant and broke down the door when they received no response to their knocks. They discovered no evidence except splinters of wood around a bureau which had been damaged apparently by a shotgun blast.

Although various officers kept the apartment under surveillance throughout the night and until early the next morning, they neither saw nor heard any sign of Bledsoe. Officers who patrolled the vicinity and contacted neighbors unearthed no additional evidence concerning his whereabouts. Pearlean Taylor, who moved into the next door apartment and first spent the night there on December 3, reported that she had seen someone leave the apartment during that day, but had neither seen nor heard anyone there since, except the police officers.

As further evidence of Bledsoe's flight, certified records from the United States District Court for the Southern District of California were introduced to show that on December 7 Bledsoe failed to appear there and forfeited bail on an unidentified criminal charge. In fact, not until March 5, 1965, was Bledsoe apprehended in San Francisco where he aroused suspicion by using a pseudonym, James Anderson. He was at that time fully advised of his rights and indicated that he did not want an attorney then.

Ronald Lutzow, who occupied the same detention cell in Los Angeles County jail, testified that appellant there confessed that on the evening of the crime he had played pool with Harris and when Harris refused to pay the $5 he owed at the

end of the game Bledsoe went home and returned with a sawed-off shotgun with which he shot Harris when he came outside.

Because Bledsoe was in federal custody at the commencement of the prosecution, he was transported by United States marshals. On May 24, 1965, following the preliminary hearing, Deputy Sterling V. Owens picked Bledsoe up and on the return trip Bledsoe mentioned to him that because Harris was a man of bad reputation who owed him money, Bledsoe felt no sorrow over Harris' death. Deputy John M. McDonough on September 13, 1965, drove appellant from Los Angeles to Long Beach and back. On the way to Long Beach, Bledsoe said he was charged with murder, but that he did not commit the murder and instead was at a friend's house when it happened. On the return trip, however, Bledsoe admitted that he had been in the vicinity at the time of the crime although he did not commit it, that he saw Harris shot from a distance of 15 rather than 4 feet, and that the cause of the crime was a gambling debt. At no time preceding or during these conversations did the deputies advise Bledsoe of his constitutional rights.

Thereafter Benjamin Washington, a cab driver, testified for the defense that, although he was uncertain of the hour, he at sometime after dark on the evening of December 3d took appellant from Jocko's to the residence of Willis George Wilson. Thereafter he returned to the 1044 Club where he watched a pool game until, perhaps three quarters of an hour later, he heard a loud noise and went outside to find the victim doubled up on the ground. Willis George Wilson, Jr., a close friend of Bledsoe's who assisted in procuring evidence for his defense, then testified that he arrived home from work about 9:20 p.m. on December 3d. When he had been there perhaps 15 minutes, appellant arrived and stayed to play records for at least 45 minutes or an hour.

Albert James White, Elsie Clark and Irene Farris, each of whom knew Mrs. Ricks well, testified that she did not have a good reputation for truth and honesty in the community. Irene Farris, who was employed by Mrs. Ricks, testified that she was in the vicinity when the shooting occurred, but she knew it was before 10 p.m. because she worked at "Mom's Pit Barbecue" the 10 p.m.-to-6 a.m. shift that week and she had not yet gone to work. Emma Pearl White, who operated the Bamboo Pit, testified that she visited the liquor store nearby the 1044 Club between 9:30 and 10 p.m. the evening of Decem-

ber 3d to obtain change. She heard gunfire and when she went outside she saw a white man running from the scene of the crime. Bledsoe is a Negro.

Finally, Jesse Allen Griffith, who shared the same detention cell in Los Angeles County jail with Bledsoe and Lutzow, testified that at no time did Bledsoe discuss the crime or surrounding circumstances in that cell, which measured 5 by 9 feet.

Appellant contends: (1) That he was inadequately represented by counsel; (2) That testimony of prosecuting witnesses concerning their observations of the apartment in Long Beach and his absence therefrom should have been excluded on the grounds that no sufficient foundation was laid identifying appellant as the occupant of that apartment and that the officers' entry was unlawful; (3) That it was prejudicial error for the court to admit in evidence a certified copy of the minutes of the United States District Court and to refuse a mistrial after the prosecution mentioned appellant's forfeiture of bail and failure to appear on December 7th; (4) That the testimony of United States Marshals Owens and McDonough consisted of admissions by Bledsoe which were improperly received in evidence. These contentions are without merit.

■ Appellant, in effect, contends that his right to counsel was abridged by the inadequate representation afforded him by public defender Olsen. In his brief he states that Olsen refused to allow him to testify in his own defense, and failed to use additional witnesses available for his defense; that he failed to impeach the testimony of his erstwhile cellmate, Lutzow. Appellant did not mention these specific complaints when, in the midst of the trial just before the defense was commenced, he requested the court in chambers to relieve Mr. Olsen because, although he had no legal grounds, he felt Olsen was not doing his utmost to prove his innocence. Bledsoe then felt he was ill-advised to plead guilty to avoid the death penalty and that, in general, he had the feeling that he was ''not getting a fair shake.'' The court pointed out that this counsel would have been remiss in his responsibility had he not discussed the possibility of pleading guilty to a ''lesser charge'' in order to obtain a more advantageous disposition of the case, and further advised Bledsoe that the court was not authorized, without legal cause appearing, to relieve the public defender and appoint private counsel at public expense. Bledsoe was fully informed of his constitutional

right to proceed in propria persona, but the court admonished him, in view of the seriousness of the charge, that he should consider carefully before making that decision, and that the court felt the public defender was doing an excellent job. Faced with these alternatives and without funds to employ private counsel, appellant finally decided voluntarily, ''I will continue with Mr. Olsen.'' Appellant cannot prevail in this contention because, in order to do so he must show that the representation provided him was sufficiently poor to reduce the trial proceedings to a farce and a sham (*People* v. *Robillard,* 55 Cal.2d 88, 97 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]). Not only does the office of the public defender in Los Angeles County enjoy an excellent reputation for thoroughness and ability (*People* v. *Adamson,* 34 Cal.2d 320, 333 [210 P.2d 13]), but the record amply supports the court's conclusion that Mr. Olsen did an excellent job of preparing appellant's defense with the material available to him, made the proper objections in the course of trial, and cross-examined prosecution witnesses with vigor and precision. The court correctly informed appellant concerning his rights to legal representation (*People* v. *Hughes,* 57 Cal.2d 89, 98 [17 Cal.Rptr. 617, 367 P.2d 33]), and appellant thereafter advisedly and voluntarily elected to continue with appointed counsel.

▮ Appellant's claim that the police officers unlawfully entered the apartment known to them as his residence cannot be sustained. The officers at that time had reasonable cause to suspect that Bledsoe had committed a felony and to believe that he resided in the apartment they entered. They knew a shotgun murder had been committed, probably by someone identified as Gladys da Veiga's boyfriend or husband, and Gladys had told Officer Robertson that Bledsoe was her boyfriend. Officer Robertson also knew Bledsoe as a suspect in other shotgun incidents, had searched his apartment before, and had seen him there. When the officers arrived at the apartment on the evening of December 3d, it was only an hour or two following the crime, and they were engaged in ''hot pursuit.'' (*Warden, Maryland Penitentiary* v. *Hayden,* 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642] (decided May 29, 1967); *People* v. *Gilbert,* 63 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365]; *People* v. *Smith,* 63 Cal.2d 779, 797 [48 Cal. Rptr. 382, 409 P.2d 222].) Under these circumstances the officers were justified in entering when there was no response and to conduct a search without a warrant.

Since the entry and search of the apartment which the officers reasonably believed Bledsoe occupied were justified, their investigation and questioning of residents in the vicinity of the apartment were equally justified. The foundation laid in this manner sufficiently identified appellant as the occupant of that apartment so as to support the investigation and testimony of neighbors that from the day of the crime until his arrest, appellant was never again observed in the area.

It was not prejudicial, as appellant contends, for the prosecution to argue and the court to admit into evidence the certified copy of the minutes of the United States District Court in San Diego showing that Bledsoe on December 7th failed to appear and a bench warrant then issued for his arrest. This further evidence of flight is relevant to corroborate the experience of officers and testimony of neighbors, and on that issue evidence that a person has jumped his bond is generally admissible. (*People* v. *Robinson,* 87 Cal.App.2d 772, 775 [197 P.2d 776].) " 'It is settled in this state that except when it shows merely criminal disposition, evidence which tends logically and by reasonable inference to establish any fact material for the prosecution, or to overcome any material fact sought to be proved by the defense, is admissible although it may connect the accused with an offense not included in the charge.' [Citations.] " (*People* v. *Perez,* 65 Cal.2d 615, 618 [55 Cal.Rptr. 909, 422 P.2d 597].) " 'The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' [Citations.] " (*People* v. *Peete,* 28 Cal.2d 306, 315 [169 P.2d 924].) In the instant case the certified documents contained no reference to the nature of the action other than to identify it as a criminal matter; there was no indication of the crime charged. Appellant surely was not prejudiced by their admission.

Finally we find, contrary to appellant's contention, that he was not prejudiced by the admission into evidence of conversational comments he made to United States deputy marshals who failed to advise him of his constitutional protections. These conversations were held after Bledsoe twice had been fully advised of these rights by officers in San Francisco

and was being represented by the public defender. The statements were relatively innocuous and insignificant in view of the other evidence adduced against him. He consistently denied commission of the crime and his statements constitute at most contradictions in his alibi defense and minor admissions. ''[T]he self-incrimination deemed to result from an improper admission does not necessarily require that we reverse as in the case of an improperly admitted confession. [Citations.] Rather, we must determine whether the People have proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citations.]'' (*People* v. *Stout*, 66 Cal.2d 184, 195-196 [57 Cal. Rptr. 152, 424 P.2d 704].)

The prosecution introduced overwhelming evidence identifying Bledsoe and connecting him with the crime before this testimony of the two deputy marshals was elicited. Mrs. Ricks, who knew Bledsoe well, rendered an eyewitness account of the crime identifying him positively as the culprit. His erstwhile cellmate testified that Bledsoe confessed to him the commission of the crime, its motive, and a description of the weapon. Strong evidence was introduced that appellant, in consciousness of guilt, took flight immediately after the homicide. He failed to return to his apartment either the night of the murder or for some time thereafter; he failed to appear in federal court as scheduled a few days later, thus forfeiting bail and hazarding a bench warrant; he gave a false name upon his arrest in San Francisco. Moreover, his statements to the marshals were not rendered during a course of interrogation designed to elicit incriminating statements, but constituted more conversation which took place enroute between cell and courthouse, and their content added virtually nothing to the weight of the evidence against appellant.

The judgment is affirmed. The purported appeal from the order denying a motion for a new trial is dismissed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied August 16, 1967, and appellant's petition for a hearing by the Supreme Court was denied September 21, 1967.