**Leander BLEDSOE, Petitioner,**

v.

**Louis S. NELSON, Warden, California State Prison, Respondent.**

**No. 69–1020.**

United States District Court,
C. D. California.

July 29, 1969.

Leander Bledsoe, in pro. per.

Thomas C. Lynch, Atty. Gen., William E. James, Asst. Atty. Gen., and Jack K. Weber, Deputy Atty. Gen., State of California, Los Angeles, Cal., for respondent.

## MEMORANDUM OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS.

CRARY, District Judge.

Petitioner is confined in the California State Prison, Tamal, California, under sentence for first degree murder, imposed October 8, 1965, by the Superior Court, Los Angeles County.

The grounds for relief are as follows:

(1) His own incriminating words, to wit, admissions to two United States Marshals were used against him over his objection and in violation of his constitutional rights. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246.

(2) He " * * * was not sufficiently identified as the occupant of Apartment No. 4 * * *," and the Police entered said apartment and searched it without probable cause.

(3) Improper admission of records of the United States District Court to prove forfeiture of bail in that Court.

(4) Denied effective assistance of counsel and failure by the Court to advise him of his right to counsel of his own choice.

Referring to petitioner's first point, the statements of the two United States Marshals involved appear in the reporter's transcript of the trial as follows: Owens, 556–562 and 562–573 (2 conversations, 2 trips, May 23, 1965 and September 27, 1965); and McDonaugh, 750–766 (2 conversations, 2 trips, both on September 13, 1965).

The conversations with which we are concerned took place between the petitioner and the two Deputy United States Marshals while they were transporting petitioner from his place of confinement in Federal custody to the State court trial in Long Beach. [R. Tr. 557.]

The first conversation took place between petitioner and Deputy Owens on or about May 24, 1965, after the preliminary hearing. In this conversation, petitioner stated that he knew the decedent Lee Harris and that the decedent had a bad reputation and owed him money, "So he had no sorrow over the fact that Mr. Harris was no longer with us." [R. Tr. pp. 562–63.]

In the second conversation on the 13th of September on the way to the courthouse, petitioner said "No" when Deputy McDonaugh asked him if he "did it", and also replied "No" when asked if he was at the scene, explaining that he was at a girl friend's house when it happened. [R. Tr. p. 759.]

The third conversation took place on the way from the courthouse to Los Angeles on September 13. The entire conversation follows:

"DEPUTY McDONAUGH: Well, how are you going to get away from the fact that this witness saw you?

APPELLANT: Well, I was there earlier.

McDONAUGH: Well, you were there then, right?

APPELLANT: Well, yes, in the area.

McDONAUGH: Well, how far away was the shotgun from this guy that got killed?

APPELLANT: They said approximately three feet, but it was about 15 feet.

**116**

McDONAUGH: So you did do it?

APPELLANT: No, I didn't, but I was there.

McDONAUGH: Well, who did do it?

APPELLANT: Well, I can't say.

McDONAUGH: Well, are you protecting someone else?

APPELLANT: Yes.

McDONAUGH: Well, what was it all over?

APPELLANT: A gambling debt."
[See R. Tr. pp. 746–47.]

The fourth conversation was between petitioner and Deputy Owens on September 27. The deputy and petitioner had just been passing the time of day in conversation unrelated to the case. Then petitioner, appearing to be worried over the case, offered that "he was thinking about taking a lower count, manslaughter, because he was just sick and tired of waiting for the trial to come up." [R. Tr. p. 566.] Deputy Owens said that he wondered what the attorneys might be trying to work out. Petitioner stated that he was unaware of any offer or deal. [R. Tr. p. 568.] Petitioner also mentioned that when he was arrested there were shotgun shells in the car which were not his. [R. Tr. pp. 571–72.]

The petitioner had been warned of his constitutional rights on two occasions following his arrest in San Francisco. [R. Tr. 763, lines 22–24.] That arrest took place on March 5, 1965. After being warned of his rights, the defendant was asked if he wanted to have an attorney present and he stated that he did not. [R. Tr. 472, line 19 to line 5, page 473.]

It does not appear that there is a reasonable doubt that the verdict was affected by the introduction of petitioner's statements to the deputies. First, the eyewitness to the murder had known petitioner for a few years and was positive in her identification. She had seen petitioner commit the murder, despite the fact that her recollection as to the distance between petitioner and the victim was probably inaccurate. Petitioner confessed to a cellmate, explaining his

motive as well as the type of weapon he used. The prosecution also introduced evidence of flight, tending to show petitioner's consciousness of guilt. He gave a false name when arrested; he did not make his scheduled appearance in federal court; he did not show up at his apartment the night of the murder nor on the subsequent day.

The first statement to the Marshal merely established that petitioner knew the victim, that he had a bad reputation, owed him money, and that he was not sorry the victim " * * * was no longer with us." In the second conversation, the defendant denied liability and professed to an alibi, stating he was not present when the crime was committed. During the third conversation, he said he had been at the scene of the crime and that the distance between the perpetrator and the victim was 15 feet. In the fourth conversation, the petitioner stated he was thinking of taking a "lower count" because he was " * * * tired of waiting for the trial to come up", and that the shotgun shells found in the car he was riding in when arrested were not his.

It does not appear that the statements constitute a confession but are attempts at exculpation, contradictions in the alibi and minor admissions. Consequently, the admission of these statements into evidence, even if it constituted error, should not result in reversal if it is beyond a reasonable doubt that the error did not contribute to the verdict. People v. Stout, 66 Cal.2d 184, 189–190, 57 Cal.Rptr. 152, 424 P.2d 704; citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Petitioner's contention with respect to the admission into evidence of the comments he made to the United States Deputy Marshals were fully considered by the California District Court of Appeals in People v. Bledsoe, 252 Cal.App. 2d 727, 60 Cal.Rptr. 703, 708 (1967), where the Court says:

"Finally we find, contrary to appellant's contention, that he was not prejudiced by the admission into evi-

dence of conversational comments he made to United States deputy marshals who failed to advise him of his constitutional protections. These conversations were held after Bledsoe twice had been fully advised of these rights by officers in San Francisco and was being represented by the public defender. The statements were relatively innocuous and insignificant in view of the other evidence adduced against him. He consistently denied commission of the crime and his statements constitute at most contradictions in his alibi defense and minor admissions. '[T]he self-incrimination deemed to result from an improper admission does not necessarily require that we reverse as in the case of an improperly admitted confession. [Citations.] Rather, we must determine whether the People have proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citations.]' (People v. Stout, 66 Cal.2d 184, 195,[1] 57 Cal.Rptr. 152, 160, 424 P.2d 704, 712.)

"The prosecution introduced overwhelming evidence identifying Bledsoe and connecting him with the crime before this testimony of the two deputy marshals was elicited. Mrs. Ricks, who knew Bledsoe well, rendered an eyewitness account of the crime identifying him positively as the culprit. His erstwhile cellmate testified that Bledsoe confessed to him the commission of the crime, its motive, and a description of the weapon. Strong evidence was introduced that appellant, in consciousness of guilt, took flight immediately after the homicide. He failed to return to his apartment either the night of the murder or for some time thereafter; he failed to appear in federal court as scheduled a few days later, thus forfeiting bail and hazarding a bench warrant; he gave a false name upon his arrest in San Francisco. Moreover, his statements to the marshals were not rendered during a course of interrogation designed to elicit incriminating statements, but constituted more conversation which took place en route between cell and courthouse, and their content added virtually nothing to the weight of the evidence against appellant."

In Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284, a recent decision of the Supreme Court of the United States, June 2, 1969, the Court held that although there may have been some constitutional error, that such error was deemed not sufficient to affect the substantial rights of the petitioner; that the case against Harrington was so overwhelming that the violation of the rule in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, was harmless beyond a reasonable doubt.

The Supreme Court found that the petitioner made statements that fell short of a confession but which placed him at the scene of the crime. Confessions of two codefendants who did not testify were admitted into evidence. The trial court instructed the jury that the confessions were to be considered only as to the confessor.

Referring to Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, the Supreme Court in the *Harrington* case says:

"It is argued that we must reverse if we can imagine a single juror whose mind might have been made up because of Cooper's and Bosby's confessions and who otherwise would have remained in doubt and unconvinced. We of course do not know the jurors who sat. Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury. We admonished in *Chapman*, 386 U.S., at 23, 87 S.Ct., [824] at 827, against giving too much emphasis to 'overwhelming evidence' of guilt, stating that constitutional errors affecting the substantial rights of the aggrieved party could not be considered to be harmless. By that test we cannot im-

pute reversible weight to the other two confessions.

"We do not depart from *Chapman;* nor do we dilute it by inference. We reaffirm it. We do not suggest that, if evidence bearing on *all the ingredients of the crime* is tendered, the use of cumulative evidence, though tainted, is harmless error. Our decision is based on the evidence in this record. The case against Harrington was not woven from circumstantial evidence. It is so overwhelming that unless we say that no violation of Bruton can constitute harmless error, we must leave this state conviction undisturbed." [Emphasis added.]

■ The Court concludes that any error in the case at bar in the admitting of the conversations of petitioner with Marshals Owens and McDonaugh was harmless error beyond a reasonable doubt.

With respect to petitioner's second grounds for relief, pages 4–R to 4–V of his petition contain the transcript of the voir dire examination relative to probable cause for the entering of the apartment.

Before entering Apartment 4, Sgt. Robertson of the Los Angeles Police Department knew that the murder here involved had been committed, from information given him by other Police Officers. The body had been removed when he arrived in the area of the homicide. He was told by Mrs. Ricks, a witness to the homicide, that the murderer was the boy friend or husband of Gladys da Veiga, who said Bledsoe was her boy friend, not her husband. He knew that petitioner was a suspect in robberies and attempted murder in which a shotgun was used three weeks before and had obtained a search warrant and searched his apartment for a shotgun at that time. No evidence was found in the search of the apartment on the night of the murder except splinters of wood around a bureau which may have resulted from a shotgun blast.

The facts surrounding the murder, which occurred on December 3, 1964, at approximately 10 o'clock, P.M., are set forth by the District Court of Appeal in People v. Bledsoe, supra, 252 Cal.App.2d 727, 60 Cal.Rptr. 703, at pages 704–705.

■ Sgt. Robertson, after his investigation, went directly to petitioner's apartment, arriving there about 11:30 P.M. He properly moved fast in the circumstances and the entry of the apartment and search without warrant were justified. Petitioner was not present at the time of entry and search.

■ Petitioner's third point concerns the admission into evidence of records of the Federal Court to show that petitioner failed to appear in that Court and thereby forfeited bail. If such was error it would be an error at law to be corrected on appeal to the State court and not a violation of petitioner's constitutional rights. Petitioner was not entitled to an error free trial and Habeas Corpus proceedings are not to be used as a substitute for appeal. Rhay v. Browder, 342 F.2d 345, 349 (9 C.A. 1965); Black v. United States, 269 F.2d 38, 41–42 (9 C.A.1959).

Inadequate representation by counsel is alleged by petitioner as his fourth grounds for relief. The District Court of Appeals in the *Bledsoe* case, supra, found that " * * * Mr. Olsen did an excellent job of preparing the appellant's defense * * *, made the proper objections in the course of trial, and cross-examined prosecution witnesses with vigor and precision." [252 Cal.App.2d 727, 60 Cal.Rptr. at 707.]

This Court has examined the reporter's transcript on appeal and finds that the factual findings of the California District Court of Appeals are supported by the record. Title 28, United States Code, § 2254(d).

The Court concludes that no right of the petitioner under the United States Constitution which would require the granting of a Writ of Habeas Corpus was violated, as contended by petitioner, and the petition for Writ of Habeas Corpus is ordered denied.