[Crim. No. 6623. In Bank. Dec. 29, 1960.]

THE PEOPLE, Respondent, v. ALEXANDER
ROBILLARD XIV, Appellant.

Vincent W. Hallinan, under appointment by the Supreme Court, for Appellant.

Stanley Mosk, Attorney General, Arlo E. Smith and John S. McInerny, Deputy Attorneys General, Keith C. Sorenson, District Attorney, and Robert Carey, Assistant District Attorney, for Respondent.

McCOMB, J.—This is an automatic appeal from a judgment of guilty of murder in the first degree.

Defendant entered a plea of guilty to the crime of murder and stipulated that the trial judge should determine the degree of defendant's crime and that a jury should be impanelled for the sole purpose of rendering an advisory verdict to the judge on this subject.

The jury returned an advisory verdict determining the degree of the crime to be murder in the first degree, and the trial judge concurred therein. Thereafter the jury returned a verdict setting the penalty at death.

*Facts*: About 4 a.m. on August 5, 1959, Officer Eugene Doran of the Hillsborough Police Department stopped defendant in the area of Bunker Hill Road and Skyline Boulevard in San Mateo County. Defendant had just finished looting some cars in the Hillsborough area, although Officer Doran did not know this.

Defendant was driving a stolen car with stolen license plates. At the time, he was on probation from a burglary conviction in San Mateo County and also a Dyer Act conviction in the federal courts.

Officer Doran used his police radio to call the Hillsborough police station to see if the car was stolen, and was informed by his dispatcher that the car was "all right."

The officer's transmission had been overheard by the San Bruno police dispatcher, who radioed to the Hillsborough dispatcher to wait a moment while the records were checked. The San Bruno transmission could be heard over the radio receiver in Officer Doran's patrol car.

Two minutes later the San Bruno police confirmed that the license plates had been stolen from a car in their city. When Officer Offield, the Hillsborough dispatcher, tried to relay this information to Officer Doran, he was unable to contact him.

Officer Offield then alerted the other police departments in the area, and shortly thereafter, about 4:50 a.m., Belmont Police Officers Stepheson and Harrington found Officer

Doran's body and the patrol car. Officer Doran was lying dead in a pool of blood after having been shot six times. His pistol had been taken from his body, and beside the body was a duplicate driver's license application issued in the name of "David Stephen Kehoe," which defendant had had issued to himself on the day prior to the murder.

On August 8 defendant was arrested by Salt Lake City police officers in a hotel in that city where he had registered under an assumed name. Defendant admitted he had been present at the time Officer Doran had been murdered. He denied that he had done the actual shooting. At the time of the trial, however, he admitted that he had shot Officer Doran after the officer had attempted to draw his own pistol when defendant had the "drop" on him.

These questions are presented for determination:

First. *Was the evidence sufficient to sustain defendant's conviction of murder in the first degree?*

*Yes.* ▮ It is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. ▮ If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment. (*People* v. *Love,* 53 Cal.2d 843, 850 [1], [2] [3 Cal. Rptr. 665, 350 P.2d 705] ; *People* v. *Newland,* 15 Cal.2d 678, 680 [1] et seq. [104 P.2d 778] ; *People* v. *Daugherty,* 40 Cal.2d 876, 885 [4], [5] [256 P.2d 911].)

▮ Applying the foregoing rules to the facts in the instant case, it appears that on the night of the murder defendant was on probation for two separate crimes and that he had committed many more offenses for which he had not yet been apprehended.

He had just previously learned that Portillo, his confederate in one of his many robberies, had been apprehended and had probably implicated him in a robbery they had committed on June 19. Defendant stated he knew he was "hot" and had even considered faking his death so that he could disappear and avoid the probationary terms of his prior convictions.

At the time he was stopped by Officer Doran, he was driving a stolen vehicle with license plates stolen from another car. He had just left the Hillsborough area after rifling some automobiles there and stealing some identification papers he found in them. At his apartment he had another stolen vehicle and a mass of other stolen items—a television set, identification

papers, credit cards, license plates etc. He fully appreciated that if these facts were discovered, he would be sent to either the state or the federal prison.

Defendant testified that he was driving along Skyline Boulevard in San Mateo County around 4 a.m. on the morning of the murder, when he noticed that a police car was following him. He first tried to lose the officer by turning off the main road, but he stopped as soon as the policeman turned on the patrol car's red light. He hid the false identification which he had just stolen in Hillsborough and then walked back to see what Officer Doran wanted.

He said that the officer asked him the usual questions, and he showed the officer the application for a driver's license that he had had issued to himself under the name of David Stephen Kehoe the day before. The officer then questioned him about the lack of registration on the vehicle, but he was able to satisfy the officer's questions on this subject.

He further testified that the officer then returned to the patrol car and checked with his office by radio to see if defendant's car was stolen and was informed that it was all right. Defendant then started to return to his car to leave, when he heard a voice on the officer's radio saying that the automobile might be stolen out of San Bruno and requesting that Officer Doran stand by. The officer told him to stand with his hands against the car. Defendant tried first to stall the officer and then pulled out his gun and covered him.

When he was first stopped, defendant had carefully placed his pistol under the thigh of his leg, so that he would have it ready for instant action if he was unable to talk his way out of his predicament. He said that he had not at that time intended to kill Officer Doran and merely wanted to get away, but when the officer tried to draw his own gun, he shot him. He kept pulling the trigger of his gun until he heard it click empty, and he then picked up the officer's gun and drove away from the area as fast as he could.

He told his friend Bosson that after he had shot the officer he got out of his car and shot him again in the neck, because "I had to be sure he was dead."

Defendant drove to his home and began to listen to the radio to see how much the police knew about the killing, and the next day began a systematic disposal of any of the incriminating evidence that might be used against him. When he thought he had covered all of his traces, he left the state.

Defendant's counsel argues that defendant acted irra-

tionally after the murder and that his panic and thoughtlessness are demonstrated by his clinging to the murder weapon with an almost morbid fascination. Actually his keeping of the murder weapon demonstrates just how calmly defendant was acting and thinking. He admitted on the witness stand that he kept the pistol because he was considering having the barrel rebored so that he could send it to the police later on to show that his pistol had not been the murder weapon and also because he thought he could use it to raise some escape money by pawning it.

Viewing the evidence logically, the murder pattern is quite clear. Defendant coldly, dispassionately and mercilessly killed Officer Doran because the officer at that moment, through the hand of fate, stood in the way of his escape and freedom. His actions before, during and after the murder clearly and unequivocally demonstrate that he premeditated the murder of Officer Doran. (*People* v. *Eggers,* 30 Cal.2d 676, 686 [6] et seq. [185 P.2d 1].)

█ The distinguishing factor between first and second degree murder is that in the former the killing must be "wilful, deliberate, and premeditated" (Pen. Code, § 189). This means the defendant must have weighed in his mind and considered the course of action he was taking, and after having considered the reasons for and against, chosen to kill his victim. (*People* v. *Honeycutt,* 29 Cal.2d 52, 61 [172 P.2d 698] ; *People* v. *Bender,* 27 Cal.2d 164, 183 [19] [163 P.2d 8].)

█ Premeditation may be shown by circumstantial evidence (*People* v. *Cole,* 47 Cal.2d 99, 106 [7] [301 P.2d 854, 56 A.L.R.2d 1435]), and may evolve from a relatively short period of consideration by the defendant of what course of action he should follow (*People* v. *Thomas,* 25 Cal.2d 880, 900 [15] [156 P.2d 7]).

█ The evidence shows that defendant had hidden his pistol under his leg when the officer stopped him and that he had practiced "quick-drawing" the gun on previous occasions. Finally, the prosecution proved the situation in which defendant found himself when stopped. He was on probation from several previous convictions and had committed numerous other crimes in the interim; and he knew that if these facts were uncovered, he faced a long prison term. He also knew that he was driving a stolen car with stolen plates and that this would cause his immediate arrest if it were discovered. This discovery became imminent when the officer

requested a "hot car" check on defendant's vehicle and received a reply that the vehicle could indeed have been stolen.

It is obvious that the trier of fact believed that at that moment defendant decided to murder the officer so that he could avoid apprehension and a long prison term. Based on the evidence in this case, such deduction was both reasonable and logical. It is likewise evident that the trier of fact rejected defendant's version of how he had killed the officer in a confused and terrorized state of mind when the officer tried to draw his gun.

When the evidence is considered in the light of the above rules, it is obvious that there is ample evidence to sustain the trier of fact's finding that the killing was murder of the first degree.

 Second. *Was defendant ably and competently represented by his counsel during the proceedings in the trial court?*

*Yes.* Defendant contends on appeal that his counsel in the trial court were negligent, ignorant, incompetent, cynical and careless and that they flagrantly misrepresented the appropriate law to him so that he was forced into pleading guilty to a crime he did not commit. He complains of the action of his attorneys in advising him to plead guilty to murder and stipulating to an "advisory" jury verdict on the question of the degree of the crime.

A reading of the record in this case demonstrates that defendant's attorneys had a very definite trial plan, to wit, to admit the shooting of Officer Doran and then portray defendant as a frightened, immature boy who had panicked when the officer tried to draw his gun. They obviously proceeded on the theory that if they could convince the jury that defendant was a truthful person who was willing to get on the witness stand in open court and frankly admit that he had shot Officer Doran, then possibly they could get the jury to believe that he was also telling the truth when he said that he had never premeditated the murder and that it was the result of an unfortunate chain of circumstances. The strategy did not work, but this is certainly no basis for saying that the minds which conceived it were incompetent.

It must be borne in mind that the two attorneys who represented defendant were chosen and employed by him. Also, it is significant that he had *two* attorneys—not just one—and that one of them was formerly the public defender

in a nearby county and a man of considerable criminal law experience.

█ The handling of the defense by counsel of the accused's own choice will not be declared inadequate except in those rare cases where his counsel displays such a lack of diligence and competence as to reduce the trial to a farce or a sham. (*People* v. *Wein,* 50 Cal.2d 383, 410 [44] [326 P.2d 457].)

█ The conduct of defendant's defense cannot be said to fall within the foregoing rule. Both of his attorneys were present in court throughout the trial of the case, and they vigorously presented every aspect of his defense. They cross-examined the prosecution witnesses at great length, successfully objected to a number of the prosecution's questions, and prevented some evidence from being introduced against defendant. In general, they conducted the defense of the case in as effective a manner as could have been done by the average lawyer.

█ When a criminal defendant asserts that his constitutional right to adequate representation by competent counsel has been violated, the burden of sustaining the allegation rests upon him. (*People* v. *Crooker,* 47 Cal.2d 348, 353 [5] [303 P.2d 753].) Defendant has failed to sustain this burden.

█ Defendant's chief complaint against his attorneys revolves around the fact that they allegedly forced him to change his plea to one of guilty on the morning of the trial and that they obtained this change of plea by misrepresenting the law to him.

The record does not show when the decision was made to enter a plea of guilty or what prompted the change from the original plea of not guilty. It is clear, however, that the guilty plea was freely and voluntarily made in open court by defendant and that this change of plea was made by him after having consulted with the attorneys selected by him to conduct his defense.

Defendant's claim of misrepresentation of the law to him by his counsel is based on his statement that his attorneys advised him that the crime he had committed had to be at least second degree murder due to the fact that he was driving a stolen vehicle at the time he killed Officer Doran.

The question whether the advice of his counsel was legally correct need not be considered by us, since it is clear that even if the advice were incorrect, such fact would not justify

the statement that defendant's counsel were therefore incompetent. ▉ However, since driving a stolen vehicle is a felony, and since any death occurring in the commission of a felony, other than those felonies enumerated in section 189 of the Penal Code, is automatically at least second degree murder, the advice may well have been correct, particularly where, as in the instant case, the killing had a direct causal relationship to the crime being committed. (*People* v. *Poindexter,* 51 Cal.2d 142, 149 [6] [330 P.2d 763].)

In this case the killing of the officer was directly related to defendant's theft and driving of the stolen vehicle. In view of defendant's activities just prior to his arrest—his stealing articles from several vehicles in Hillsborough—it could well be said he was in the process of making his escape from these crimes, and this again would automatically make the killing at least second degree murder.

Likewise, at the time defendant was stopped by the officer he was on probation from felony convictions in both the state and the federal courts. Since possession of a concealed firearm by any person who has been previously convicted of a felony is also a felony in this state (Pen. Code, § 12021), the death of the officer would also automatically be at least second degree murder on this theory.

It cannot be said that the advice and representation given to defendant in this case was of so low a quality that his trial was but a ''farce or a sham,'' and his argument in this regard is without merit.

▉ Third. *Did the trial court commit prejudicial error in receiving in evidence (a) a manikin, which was used to illustrate the path of the bullets fired into Officer Doran's body by defendant, (b) photographs of the deceased officer, and (c) evidence showing some of defendant's past crimes and illegal activities?*

*No.* All the evidence here in question was admitted during the trial on the issue of the degree of the crime, and defendant was not being tried by a jury on this issue. It had been stipulated by both parties at the commencement of the trial that since defendant had pleaded guilty to murder, the jury would act only in an advisory fashion on the question of degree. The actual question of what degree of murder defendant had committed was to be decided by the trial judge. Therefore, a court trial, and not a jury trial, was taking place, and the question whether the evidence was inflammatory to the jury is irrelevant.

 A trial judge is much less likely than a jury to be prejudiced by allegedly inflammatory or improper evidence, since his well-trained legal mind will reject such evidence if it is improper and view it in its proper light and for the limited purpose for which it was introduced. (*People* v. *Jones*, 52 Cal.2d 636, 654 [20] [343 P.2d 577].)

However, in the present case the questioned evidence was properly admitted.

 (a) The manikin was a perfectly proper method of introducing highly relevant evidence. It was extremely important in this case to present the manner in which defendant had shot the officer. No one saw the shooting. Therefore, the prosecution was entitled to demonstrate the position of the wounds in the officer's body in order to substantiate its theory that defendant had literally executed the officer in order to escape detection.

Dr. Lack, the county pathologist, testified that he found six bullet wounds in Officer Doran's body and that he had established the trajectory of the bullets into the body. He then described these various wounds and trajectories in the appropriate medical terms. Thereafter, he identified a group of photographs which illustrated the trajectories and explained that he had also prepared the manikin to demonstrate further his previous testimony.

The use of a dummy under such circumstances in a homicide case to show the type and placement of the wounds received by the victim is proper. (*Ford* v. *State*, 222 Ark. 16 [257 S.W.2d 30, 33 [13]].)

 The rule is settled in California that the use of demonstrative evidence, even though it may have some prejudicial effect, is admissible as long as it "tends to prove a material issue or clarify the circumstances of the crime." (*People* v. *Cavanaugh*, 44 Cal.2d 252, 267 [13] [282 P.2d 53] ; *People* v. *Brubaker*, 53 Cal.2d 37, 48 [346 P.2d 8].)

 Defendant claimed that he had shot Officer Doran six times in rapid succession when the officer tried to draw his gun. Placement and trajectories of the bullets in the officer's body tended to belie this story. Dr. Lack, in answer to questions put to him by defendant, testified that in his opinion the wounds in the body could not have been inflicted in the manner described by defendant. The criminologist, Mr. Grodsky, also testified that two of the bullets fired into the officer's body had been fired at extremely close range,

which would indicate that the shots had not all been fired at the same time.

The district attorney properly used the manikin in his argument in support of his theory as to how the crime was committed, particularly that it tended to show that the murder was a cold-blooded killing. (*Cf. People* v. *Jones, supra,* at 654 [18].)

(b) The photographs of the deceased officer's body taken at the scene of the murder were properly received in evidence. (*People* v. *Love,* 53 Cal.2d 843, 852 [6] et seq. [3 Cal.Rptr. 665, 350 P.2d 705] ; *People* v. *Brubaker,* 53 Cal.2d 37, 48 [11] et seq. [346 P.2d 8].)

Defendant complains about the photographs of the deceased's body taken during the autopsy. These photographs were merely marked for identification and were never received in evidence. Therefore, there is no merit to defendant's contention that they were improperly received in evidence.

(c) It was not error to receive evidence of defendant's past crimes. This evidence was relevant to establish defendant's motive for the killing, the prosecution's case being based on the theory that defendant had premeditatedly killed Officer Doran in order to avoid apprehension for such crimes.

Defendant contends that the evidence was introduced for the purpose of inflaming the jury. However, as heretofore pointed out, the question of the degree of the crime was to be decided by the trial judge. The only thing the jury was really deciding was the proper penalty to be imposed.

In view of the provisions of section 190.1 of the Penal Code permitting the presentation of evidence "of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty" during the penalty phase of the trial, evidence of defendant's prior crimes was admissible for consideration by the jurors in fixing the penalty. (*People* v. *Jones, supra,* 52 Cal.2d 636, 647 [4].) Under the circumstances, it made no difference that they heard such evidence during the guilt phase of the trial rather than during the penalty phase.

Fourth. *Was it error to permit the jury to sit in an advisory capacity during the trial on the degree of defendant's crime?*

*No.* Defendant argues that this procedure was prejudicial to him since it allowed the jury to hear the evidence of his other offenses. This contention is clearly devoid of merit,

since the use of a jury in an advisory capacity was expressly and personally consented to by defendant after he had been fully advised on the subject by his attorneys and with a full and complete understanding of not only what was being done but why it was being done. In view of his free and voluntary consent to the procedure followed, defendant cannot now be heard to complain of it. (*People* v. *Feldkamp,* 51 Cal.2d 237, 241 [2] [331 P.2d 632]; *People* v. *Dessauer,* 38 Cal.2d 547, 552 [5] et seq. [241 P.2d 238].)

The procedure followed in using an advisory jury was not just a whim or caprice of counsel or the trial court. There was a logical and reasonable explanation for proceeding in this manner. All parties to the action realized that if it was determined that the murder was first degree, a second phase of the trial would have to be conducted; and unless the jury heard the evidence presented during the first part of the trial as to how the crime was committed and the circumstances surrounding it, this evidence would have to be repeated in the second phase. Defendant's counsel specifically mentioned this fact in his discussion about the procedure to be followed, and it was for this reason that the procedure used was adopted.

Fifth. *Did the trial court err in stating to the jury at the completion of the first phase of the trial that he agreed with their finding of first degree murder?*

*No.* The statement of the trial judge cannot properly be interpreted as an indication of prejudice on his part against defendant or in favor of the prosecution, nor can it be properly contended that this remark degraded defendant's attorneys before the jury.

A trial judge should employ extreme caution so as to avoid conveying to the jury any personal opinion on his part as to the issues on trial in any manner that would suggest he was invading their fact-finding function; but, on the other hand, the trial judge has an extremely broad power to comment on the evidence presented in the case. (*People* v. *Friend,* 50 Cal.2d 570, 578 et seq. [327 P.2d 97].) The trial court's comments in this case were both proper and temperate, and no error was committed thereby. (*People* v. *Turville,* 51 Cal.2d 620, 637 [23] [335 P.2d 678].)

Sixth. *Did the trial court err in not giving further instructions to the jury on defendant's mental condition at the time of the officer's murder?*

*No.* The ultimate determination of guilt in this case was to

be made by the trial judge rather than the jury. In view of this fact, it was unnecessary for him to give any additional instructions to the jury on this subject. Instructions are given to a jury by a trial judge in order to explain to them the law applicable to the particular issues in a case, and where the case is to be decided by a court, rather than the jury, no instructions are required.

As far as the jury was concerned, the trial court properly instructed the jury on the subject of defendant's mental condition at the time of the murder. He instructed them as follows: ''You are reminded that a person might be legally sane, as we define that term in dealing with a question of criminal responsibility, and yet be in an abnormal mental or nervous condition; and because of such condition he might be less likely or unable to have or hold a specific intent or a certain state of mind, which is an essential ingredient of a certain degree of crime. We have received evidence bearing on the mental and nervous condition of the defendant at the time of the commission of the crime charged. Such evidence may be considered by you in determining whether or not defendant did any act charged against him and, if so, whether or not, at that time, there existed in him the specific mental factor and intent which must accompany that act to constitute a certain degree of crime. You do not have before you any issue as to the defendant's legal sanity.''

If defendant felt that this instruction did not adequately cover the subject, he should have asked the court for further instructions on the subject or have offered some instructions himself. (*People* v. *Turville, supra,* 51 Cal.2d 620, 633 [9].)

Seventh. *Did the district attorney commit prejudicial error in his argument on the penalty phase of the case?*

*No.* Defendant contends that the district attorney committed prejudicial error in arguing to the jury that the death penalty should be imposed because defendant would be eligible for parole after seven years should the jury impose a life sentence on him. The propriety of such an argument has been established by this court. (*People* v. *Purvis,* 52 Cal.2d 871, 884 [13] [346 P.2d 22].)

There is likewise no merit in defendant's contention that the district attorney's comments about the Adult Authority were improper.

In addition, defendant may not now be heard to object to the district attorney's argument, since he made no objection at the time it was made and did not ask the trial court to instruct the jury to disregard it. (*People* v. *Turville,*

*supra,* at 636 [20]; *People* v. *Hampton,* 47 Cal.2d 239, 240 [3] [302 P.2d 300].)

It would appear from a reading of the record in this case that it is remarkably free of any type of misconduct by the district attorney or defendant's attorneys. No error appears.

The judgment is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., White, J., and Dooling, J., concurred.

Appellant's petition for a rehearing was denied January 25, 1961.