[Crim. No. 438.   Fifth Dist.   June 19, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. LA MONT WALTHER, Defendant and Appellant.

John M. Beede, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Philip R. Birney, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—The defendant, LaMont Walther, was convicted by a jury of grand theft in that he stole personal property of a value in excess of $200 from John Andrew Erickson; the record indicates that, through elaborate trickery, the defendant gained $180,000 by his crime. The evidence, incidentally, also shows that three legitimate businessmen of southern California, who were accustomed to handling large sums of money, were victimized in part through their unbelievable credulity and in part through their willingness to engage for profit in undercover negotiations with a person later proven to be a downright crook, who had served at least one prior term in the state penitentiary.

Originally the grand jury of Yolo County indicted LaMont Walther for violation of section 484 of the Penal Code (grand theft) in that on July 31, 1964, he stole personal property of a value in excess of $200 from John Andrew Erickson. The indictment was later amended to add a prior conviction of robbery of the first degree in the County of Sacramento on or about the 23d day of November 1923, for which he served a term in the California state prison. The defendant admitted the prior conviction but denied his guilt on the current charge.

The record shows that John Andrew Erickson of Lakewood, California, manager of a water company and an investor whose net worth was approximately $450,000, wanted to buy raw gold. He met a person named Schneider, supposedly a Utah attorney and an agent for owners of placer gold. Erickson testified that he checked on Mr. Schneider's credentials and was persuaded by people purporting to be United States government secret service employees that Schneider was a legitimate attorney and had carried on business dealings relative to mining in Washington. Erickson induced a friend named Hodges to join him in the venture, and at a later time also enlisted another businessman, named McAllister, in the joint venture.

Erickson had entered into a contract with a New Jersey firm to purchase placer gold at a fixed figure when he should acquire it. Erickson's actual deal for purchasing the placer gold at frequent intervals was to be secret. The purported real sellers of the gold never allegedly permitted their names to be used. It was understood that Erickson and Hodges would go from southern California to San Francisco, would there rent two automobiles, take with them an assayer who would test the tendered placer gold and the sale would then take place secretly by the purchasers exchanging cars with the seller. During the first part of July 1964, Erickson and Hodges took with them one Dunkel, an assayer, from Los Angeles and flew to San Francisco carrying $120,000 in cash. They were met at the airport by Schneider, there rented two cars and went to Vallejo, where Schneider introduced them to a man called Mack, supposedly an employee of the gold owners. He was to check the money and exchange the placer gold for the cash. Mack is the appellant. Erickson and Dunkel drove to a telephone booth near Vallejo and waited there for two and one-half hours, finally received a telephone call to the effect that the sellers of the gold could not sell or deliver such a small amount. The entrepreneurs then flew back to Los Angeles.

On July 14, 1964, this same weird procedure was again followed with two rented cars journeying helter-skelter in the bay region near Vallejo and the use of public telephone booths; on this second occasion, the businessmen had been forced to employ an assayer other than the one originally taken with them, and the ''sellers'' of the gold told the purported buyers that they would not make the contact and deliver the metal, because they did not recognize the new assayer and feared a trap and that more than $180,000 would be required to swing the deal.

Again, Erickson and his associates flew back to Los Angeles. For a third time, these committed buyers flew north to the San Francisco airport, this time with $180,000 in cash and followed the same amazing pattern which they had adopted before, meeting Schneider at the airport, motoring to Vallejo in the two rented cars, with Erickson and Thomas, the assayer, later going by direction to a public telephone booth near a gas station in Walnut Creek where they waited for four hours. The assayer testified that he and Erickson sat all afternoon long in Walnut Creek at a gas station near a phone booth. Mr. Erickson stayed there two or three hours and the assayer four or five hours; Erickson left and went someplace

else; the assayer was within a radius of 30 to 40 feet from the telephone booth all the time. Erickson returned to Hodges and McAllister in Vallejo where they were keeping watch over the $180,000. Schneider and the appellant made several telephone calls from the public phone booth and they finally said that the shipment of gold had been hijacked. But Schneider urged the gold buyers to stay overnight, saying that he hoped something could be worked out. The purchasers did remain nearby at a Walnut Creek motel, and the next morning Schneider told them they must all go to the Nut Tree Inn to meet the defendant; they were informed that the defendant had lined up a sale of 10,000 ounces of placer gold. Abandoning the original plans outlined above, Erickson and the defendant by agreement went together in one car with the money to exchange it for the gold. Erickson supposedly was quickly instructed on how to assay the gold; taking a loaded pistol with them, the defendant and he went off from the Nut Tree Inn toward Zamora. During the trip, defendant told Erickson to take the wrappers off the money; defendant drove the car onto a cut-off road between Zamora and Woodland. He drove past an access way to a ranch several times, saying that he was looking for a signal. On the third pass along the road, defendant said that he had seen a signal and stopped the car, claiming that an alleged new pile of rocks constituted the signal. Erickson and the appellant continued along the lonely road to a gate on a semi-used roadway and Erickson at the request of Walther got out to open the gate; the latter then drove rapidly away with the $180,000 calling back to Erickson to go on, in that he was just testing him; Erickson managed to get to a farmhouse and finally to notify the sheriff of Yolo County at Woodland by telephone.

The record shows that the defendant got to Woodland well before Erickson where he purchased an old Buick automobile for $250 in cash, paying with $20 bills. Then, he disappeared and was not seen for something over two years.

When Erickson got to Woodland, he reported fully to the sheriff's office; none of the money was ever recovered and no gold was ever delivered to Erickson or any of his people.

Appellant presents five arguments on appeal, all having to do with the admission of evidence; he alleges

1) That the court committed prejudicial error by allowing hearsay testimony including the opinion of a third person;

2) That error was committed by allowing evidence of a prior attempted theft to show a common plan or scheme of criminal operation by appellant;

3) That it was erroneous not to permit the defense to question Erickson when the scene of the alleged crime was visited by the jury and it was also error for the court's there examining Erickson and to assume facts not in evidence;

4) That the verdict was not supported by sufficient evidence; and

5) That error existed when the court allowed Erickson and McCullen to present hearsay evidence relating to an alleged clearance of Schneider by the Treasury Department.

■ Throughout an examination of the record we keep in mind that the appellate court is not bound by the same rule that applies to the trier of fact in the court below. As is said in *People* v. *Robillard*, 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086] : "It is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt." Our duty is thus expressed in the opinion in *People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778], where it is said that we must " '. . . assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury."

■ *People* v. *Torres*, 201 Cal.App.2d 290, 294 [20 Cal. Rptr. 315], points out that the elements necessary to prove grand theft are the taking of personal property (which in the case of grand theft must exceed $200 in value) from the owner, into the possession of the criminal without the consent of the owner or under a claim of right, the asportation of the subject matter, and by the specific intent to deprive the owner of his property wholly and permanently. This requisite intent may be shown circumstantially. (*People* v. *Moore*, 234 Cal. App.2d 29, 31 [44 Cal.Rptr. 184].)

■ Having resorted to complex trickery by finally inducing Erickson to get out of the automobile to open a gate, the defendant rapidly backed away from where Erickson was standing and escaped with the $180,000, which was in a container on the back seat of the hired automobile. There with all

clarity was the asportation of the $110,000 belonging to Erickson, the $10,000 of Hodges, and the $60,000 of McAllister. Was the intent to commit theft present? Undoubtedly it was. Part of the money taken by Walther was spent by him to purchase the old Buick automobile in Woodland, and the appellant fled and remained successfully in hiding for over two years. No reasonable inference can be drawn from these unquestioned facts except that the defendant was guilty of grand theft. The evidence is amply sufficient to prove the guilt of the appellant.

Strange contentions were made by defendant's counsel in an effort to persuade the jury to free him. It was intimated that Erickson, rather than Walther, stole the money. This argument is ridiculous on the face of things, because Erickson himself was the owner of $110,000 worth of the $180,000 in small bills, which the defendant had insisted would be the form of the monetary transfer. The accompanying facts of the theft are completely at outs with any common sense thought other than that Walther, in fleeing from the secluded scene of the crime, was guilty. On the other hand, the actions of Erickson after the theft clearly supported the conclusion that he had not stolen the money.

It was also suggested by counsel for the defense that perhaps others than Walther or Erickson had stolen the money or at least had helped to negotiate the deal; if there were other persons also chargeable with crime, they presumably could have been prosecuted or perhaps may still be informed against for theft, but so far as we are aware there is no proof that anyone other than Walther gained anything from the theft. It is also urged that the secret dealings of the people on both sides, the failure to ascertain the names of the purported owners of the gold, the alleged disregard of various provisions of federal and state law with respect to gold sales, and the hush surrounding all of the negotiations would lead to the inference that everyone on both sides of the transaction was involved in a conspiracy to break the law; even if this were true, such a situation would not excuse the stealing of the money by the defendant. The evidence is not only sufficient to justify the conviction, it is overwhelming, and the only hope of appellant for a reversal of the judgment of conviction lies in proof of some major prejudicial error during the trial.

Appellant's chief complaint is directed against the testimony of Dr. William J. Thompson, who testified with

respect to a similar happening in 1963 by which the defendant attempted to cheat the doctor. This evidence was admitted, as stated by the court to the jury at the time it was received, for the limited purpose of tending to prove the identity of the person who committed the crime in the instant case, and a plan, scheme, system or design of the defendant for committing a theft of the kind charged in the present indictment. Dr. Thompson, an optometrist, testified that he negotiated with the defendant in the year 1963 for the purchase of placer gold; there were many conferences; Thompson traveled from Oregon to Sacramento and to San Francisco for meetings with defendant, and a transaction was finally arranged for July 9, 1963, in Sacramento; Thompson flew from Medford to San Francisco and there met a friend, who was an assayer named Giampaoli; the two flew by chartered plane to Sacramento to meet defendant at the King's Truck Stop Cafe in West Sacramento; from the Sacramento airport, they traveled by a rented Hertz Chevrolet. When Thompson arrived at the King's Truck Stop, he had $40,000 in cash with him, and another $140,000 waiting in Tucson if he needed it; $30,000 had been left with the pilot. Dr. Thompson testified that defendant said they would need a van-type truck in which an assayer could stand up to perform his technical work, and that such a truck should be rented and taken to a warehouse for the loading of the placer gold. Walther advised them to get heavy-duty cardboard cartons to transport the gold and that portions of the airplane should be reinforced with plywood to carry the excessive weight of the cartons of gold. Dr. Thompson did these things as directed, then returned to the truck. He checked with defendant and then checked again with the pilot, and later met the defendant at 2 o'clock at an A & W Root Beer stand. Thompson also rented a second Hertz automobile at the El Rancho Motel and left it parked in the lot at the El Rancho, because he was afraid if someone else knew of the transaction he might be held up taking the gold to the airport, and he wanted another vehicle in the transfer which had not been identified to transport the gold. At 2 o'clock, defendant said there were further delays and an arrangement was made to meet him at the truck stop at 4; defendant then made two or three telephone calls. Thompson drove defendant to a warehouse. By this time it was 6 o'clock; they returned to the truck terminal. Defendant said they would not be able to make the pickup with the truck— that they would have to do it with his car. He left the truck

stop with his car and returned in 30 or 40 minutes in his Cadillac with the trunk loaded presumably with gold and the car, consequently, riding low on its rear wheels. Defendant then opened the trunk of the Cadillac and unloaded a number of 50 caliber ammunition boxes and carried them to the van of the truck, putting them in the forward part of the vehicle near the cab. After the boxes were thus loaded, Giampaoli got out of the Chevrolet, removed his assay equipment and placed it in the back of the van. Walther then went over to Thompson with two empty ammunition boxes and said that Thompson could put the money into them. Mr. Giampaoli got into the truck as did the defendant. Then, the assayer yelled, "Help! Doc!" Thompson took the money which had not yet been transferred into the ammunition boxes, put it in the trunk of the Chevrolet, threw the trunk key as far as he could throw it and ran to the back of the van. Giampaoli was on his back on the floor in the front part of the van. Defendant was coming out of the back of the van in a hurry, with a tire iron in one hand. Thompson got in and helped Giampaoli out of the van. He was bleeding from an area in the left rear occipital region and he had swelling on that part of his head. Giampaoli stated, after they were both in the Chevrolet, that as soon as he had opened the first box he saw that it was not gold, but wet sand and defendant then hit him over the head. The two men locked the doors of the rented Chevrolet and started the motor. Defendant walked to his Cadillac, which was about 20 feet to the rear of the van and got into it; he immediately then got out of the Cadillac, unloaded the ammunition boxes from the van and put them back in his own car and drove away. Thompson got defendant's license number but decided not to try to follow him; they bought ice from a store to put on Giampaoli's head. Defendant had seen the money Thompson had with him earlier at about 10 o'clock in the morning when defendant got into the Chevrolet with Thompson, and Thompson drove a quarter of a mile down the road that runs parallel to West Capitol, stopped the rented Chevrolet, went around to the trunk, got the bag with the money out of the trunk and threw it in the front seat. At that time, defendant went through the money; he did not count it bill by bill but checked to see that Thompson had approximately the correct amount of money, that the bills were good and that the serial numbers were not consecutive. Thompson on cross-examination testified that he did not contact any police department with regard to the transaction and that he

did not see what happened in the truck and, except for what he was told, he did not know why the blow was struck.

Under the present rules as stated in the Evidence Code following the analysis of the situation made by Wigmore, it would seem that the evidence is admissible. Wigmore says that this exception to the hearsay rule is controlled by the three following principles:

1. "There must be some *occurrence startling enough* to produce this nervous excitement and render the utterance spontaneous and unreflecting." (6 Wigmore, § 1750, p. 142.) The assayer, expecting to find gold in the ammunition boxes, found wet sand. Immediately after the assayer made this discovery appellant hit him over the head.

2. "The utterance must have been *before there has been time to contrive and misrepresent, i.e.,* while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance." (Wigmore, *supra.*) All of the assayer's statements were uttered within ten minutes after he was hit on the head by appellant; and

3. "The utterance must *relate to the circumstances of the occurrence preceding it.*" (6 Wigmore, § 1750, p. 155.) The statements in question obviously related to the preceding occurrence; i.e., the assayer found sand, not gold, was hit by appellant, and feared further injury. (*Showalter* v. *Western Pacific R.R. Co.* (1940) 16 Cal.2d 460, 468 [106 P.2d 895].) See Witkin, California Evidence (2d ed. 1966) section 544, pages 516-517.

Expecting to find placer gold in the ammunition boxes, the assayer found wet sand instead, and immediately thereafter the appellant hit the assayer over the head with an iron bar. The statements made by the assayer were uttered within 10 minutes after he was hit on the head. Unquestionably, the assayer was under extreme tension, and it does not take any fancy imagination to realize that he must have been excited in the circumstances.

▮▮▮▮ Appellant objects to the testimony of the prior gold activity in 1963 on the ground that the evidence is not relevant, arguing that the statements have no connection with the presently alleged crimes, and have nothing to do with any facts in issue in the instant case, that there was no evidence in the present case as to sand, gravel or gold. Appellant also objects that the evidence of the offense occurring in 1963 was admitted on the spontaneous exclamation exception to the hearsay rule and contends that it did not qualify for that

rule, that the court also allowed the evidence to show common scheme, common motive or plan and to show the intent of the performer and his identity. Appellant objects first that it was not proved exactly as to what happened in the van in that Thompson was not an eyewitness, and that, consequently, there was no proof that a crime had really been committed and the testimony should have been omitted on that basis alone, that the crime, if any, which the defendant committed in 1963 would have to have been a misdemeanor battery, and to show a common scheme or motive, a prior offense of a battery should not be used to show grand theft. However, by denying the crime the issue determinative of defendant's guilt or innocence is the question of his identity as the thief. As was said in *People* v. *Henderson,* 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677], this evidence was relevant on the issues for which it was received, and although there is a risk of prejudice in allowing evidence of prior offenses, evaluation of the risk rests in the discretion of the trial court. In *People* v. *Lopez,* 60 Cal.2d 223, 249 [32 Cal.Rptr. 424, 384 P.2d 16], the court stated: " '. . . except when it shows merely criminal disposition . . . evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged.' " (See *People* v. *Cook,* 148 Cal. 334, 340-341 [83 P. 43] ; *People* v. *Peete,* 28 Cal.2d 306, 314-315 [169 P.2d 924].) Evidence may be allowed to show a common scheme, a common *modus operandi.* (*People* v. *Houston,* 219 Cal.App.2d 187, 192-193 [33 Cal.Rptr. 26].)

The arrangements to buy and sell gold were, indeed, strange ones.

It was certainly relevant to the present crime to have evidence that in 1963 there were the same odd negotiations with an agent for unknown sellers of placer gold, that the witness flew from a distant point to make the purchase and that there were cars to be rented as part of the plan; that the sale had to be made with cash using old unserialized bills, that arrangements were made for an early morning meeting using a van-type truck for the assay, that there was an alleged delay in the gold's arrival, the inspection of the money, the different meeting times scheduled during the day, a change in plans from getting the gold in a car rather than in a truck, and the loading of the ammunition boxes—the whole affair was certainly an incredible one, which would be relevant in light of the weirdness of the alleged arrangements in the presently

322

concerned activities. The statement that the man assaying the gold needed help, the finding of the gash on his head, the defendant's coming out of the van holding a tire iron, the implication that Walther's trick was found out and, therefore, the defendant attacked, were relevant. In the present case, the court instructed the jury that the evidence was being limited only for any bearing it might have on the question whether the defendant was innocent or guilty of the crime charged against him in the present action, and that it could not be considered for any other purpose. It could only be used to see if it showed the identity of the person committing the alleged crime or that he held the necessary intent, or if there existed in the mind of the defendant a plan, scheme, system, or design into which fitted the commission of the offense for which he was being tried. During the court's instruction to the jury, this admonition was again repeated. Defendant spent much of his time saying that the element of intent was not in issue, because appellant did not take the stand. However, this is not so. ▓▓ For defendant to be found guilty of the crime (Pen. Code, § 484), there must be an intent to deprive the owner of his property wholly and permanently; defendant pleaded not guilty to this charge; obviously, the element of intent was in issue.

▓▓ It must be remembered that admissibility of evidence of this type is a question for the trial court. (*People* v. *Gay,* 230 Cal.App.2d 102, 104 [40 Cal.Rptr. 778].) The trial court heard Dr. Thompson on *voir dire,* listened to the arguments of counsel, and instructed the jury; the judge used his discretion with care and there is no abuse shown.

▓▓ Giampaoli's statement that the boxes contained sand was not an expert opinion but one of common knowledge; no qualification as an expert was necessary.

▓▓ A further objection of the appellant is leveled at the visit of the jury to the premises where the theft was accomplished. The defendant himself, through his counsel, prevailed upon the court to have the jury visit the scene of the crime; defendant is, therefore, in no position to object to the fact of the visitation. Section 1119 of the Penal Code authorizes the court to make such an order when in its opinion it is proper ". . . that the jury should view the place in which the offense is charged to have been committed. . . ." The trial court properly instructed the officer in charge of the jury as to his duties and was careful to see that, while all of those going to the scene of the alleged crime were in the same bus including

the defendant and others whose duty it was to be present, the conduct of everyone was required to be beyond exception.

■ The court appointed Mr. Erickson as the person who should point out the various elements involved in the view. While this was somewhat unusual in that the court normally appoints a court officer to take charge of such direction, it was obvious that among those present in the bus Mr. Erickson and the defendant were the only persons who had been at the scene of the alleged crime when it was committed, and, generally speaking, the oral statements of Mr. Erickson were legitimate. In one or two instances perhaps the complaining witness somewhat overstepped a neutral position. But no harm was done to which an exception can now be made. The leading case of *People* v. *Pompa,* 192 Cal. 412, 421-423 [221 P. 198], correctly points out that where, as in the present instance, no objection is made to the appointment of the person showing parts of the premises, the defendant cannot later complain. ■ In putting certain questions to the ''shower,'' the trial judge intended to clarify and expedite the proceedings; as to any other alleged irregularity at the scene of the view or afterwards in court, there can be no contention on appeal that there was error, for the silence of the defendant's counsel in those circumstances constitutes a waiver. (See also *People* v. *Fitzgerald,* 137 Cal. 546 [70 P. 554]; *People* v. *Rolfe,* 61 Cal. 540, 542; *People* v. *Tarm Poi,* 86 Cal. 225 [24 P. 998]; *People* v. *Lindsay,* 227 Cal.App.2d 482, 507 [38 Cal.Rptr. 755].) It should be noted that not only was there no objection of any kind made by the defendant to the procedure but, although cross-examination of Mr. Erickson was made upon the return of the jury to the courtroom, no reference was made to any essential factor produced by the visit.

■ Objection is made also that there was error in the testimony of Erickson and the witness McCullen relating to a clearance obtained from the Treasury Department and advice from the secret service concerning Mr. Schneider. The appellant contends that such evidence had no relevancy in the case and that the relation of contacts to government departments only served to give weight to the testimony of the witnesses, and because the statements were hearsay they should not have been admitted. The evidence obviously was admitted to attempt to show the good faith of Erickson and his business partners in making ample inquiry as to the nature of the

324

people who were suggesting a deal be made for the sale of gold. It is not to be wondered at that the prosecution took every means available in view of the secrecy of the deal to show that the complaining witnesses had made reasonable efforts to ascertain that the people with whom they were dealing were aboveboard. We find no error in the admission of such evidence.

The judgment is affirmed.

Stone, J., and Gargano, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 14, 1968.