[Crim. No. 16039.  Second Dist., Div. One.  Feb. 9, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
MINNER V. DEMERSON, Defendant and Appellant.

**COUNSEL**

Kathleen J. Kirkland, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**LILLIE, Acting P. J.**—The trial court found defendant guilty of grand theft (§ 487, subd. 1, Pen. Code); she appeals from judgment and sentence.

In January 1964 William Moore, a cab driver, purchased a home on West 36th Street from Rita Bowie making a down payment of $1,000; Mrs. Bowie held a second deed of trust and the property was financed through Pacific Savings and Loan Association. Moore made some payments on both the mortgage and deed of trust but when he was in default on the mortgage Pacific foreclosed in September 1965; notice of default was filed December 29, 1965. A certified letter advising Moore of this was mailed to him but returned to Pacific "unclaimed";[1] Mrs. Bowie received notice from Pacific indicating that because of the foreclosure her second deed of trust was in jeopardy. Meanwhile Moore wanted to sell the property; once his next door neighbor, Mr. Bender, told him he was interested but it was never discussed again.

Mr. and Mrs. Bender had known defendant in Mississippi; they met her again at a party through Mrs. Wheat; defendant told them she was a real estate broker. In December 1965 defendant, using the name Minnie V. Heidelberg, went to see Mrs. Bender and discussed with her the sale of Moore's house showing her some papers. In December 1965, defendant also went to see Moore and told him her name was Dorothy Kitchen and she was in the real estate business and had seen the sign on the 36th Street property, and asked the selling price; Moore said he wanted $2,000. Defendant then returned to Mrs. Bender, said she had to have a $2,000 down payment and showed her a contract which the Benders signed and defendant kept. The next morning defendant took Mrs. Bender to the Bank of America where Mrs. Bender obtained $2,000 in cash; outside the bank Mrs. Bender gave the $2,000 to defendant. When defendant dropped her off at home she gave Mrs. Bender a blue contract (after Moore started suit defendant picked up the contract to take to the attorney and never returned it).

About a week later defendant returned to see Moore; she said she would like to buy the property but could not give him $2,000; Moore said if she would give him $1,000 he would turn the house over to her. Several weeks later in the morning defendant returned and told Moore she had the money ($1,000) "But first we will have to complete these papers, and I will have to take them back to my attorney for his signature, and the real estate man, and everything," and "I have to get these papers prepared, then I can give you the check." Moore told her that when she gave him the check he would

---

[1] It appears that Moore moved out of the premises and lived at several other addresses during the incident herein.

sign the papers, but she said, "No," she had to have a "quick deed" because the office was going to close, the real estate man would be gone and without the deed she could not complete the deal that day and turn over the money. Then she gave a blank deed which Moore signed. No notary was present. Defendant gave him a document to the effect she would give him $1,000 upon completion of the deal, and a receipt for the deed. They agreed to meet at 2:30 at "the office" at the corner of 84th and Western with all the papers and she would turn over to him the check for $1,000. Moore appeared at the designated time and place but defendant did not appear; the woman in the office there told him she had never heard of defendant; he waited for 20 or 30 minutes, then left and never saw defendant again, although he had detectives try to find her. A week or so after Mrs. Bender gave defendant the $2,000 in cash, defendant gave her a grant deed. After exhausting every means to find defendant, Moore's attorney advised him to rent the house to "smoke them out"; he did so and in several days defendant and Nathan Wells appeared and told the tenants to vacate (Moore did not know Wells). Mrs. Bender met Wells at that time; defendant brought him "to prove to [her] that the deeds was [sic] good."

Sometime during December 1965 Mrs. Bowie offered the second deed of trust to the Benders for $1,000; in January 1966, the Benders gave a cashier's check ($700) to defendant to pay it off. Mrs. Bowie sold the second trust deed to defendant and a man for $700 and received the cashier's check. Defendant did most of the talking during the transaction. Altogether the Benders paid defendant $2,700 for the property, and continued the payments at Pacific starting in February 1966 using cards brought to them by defendant; they have never gone to the Pacific office. Pacific files reflect an assumption agreement signed by the Benders and an application form incorporated therein; the documents were not notarized. The Benders have in their possession the grant deed signed by Moore; Moore subsequently lost possession of his house on 36th Street to the Benders.

Defendant denied she knew Moore or had ever entered into any transaction with him or ever talked to him. She testified that she knew Mrs. Bender in Mississippi; Mrs. Bender sent Mrs. Wheat to see her because she heard she (defendant) was studying real estate and wanted her to help her understand how she could purchase the Moore property; she and the Wheats went to see Mrs. Bender who asked her to write a sample copy to show how to get the Moore property without going through a real estate agent; Mrs. Bender said Moore wanted to sell but she (Mrs. Bender) was afraid he did not understand what he was doing; she filled out the receipt signed by William J. Moore (except for the signature) and put in the names Ray and Dorothy Kitchen, dummy names she used in setting up the copy to show Mrs. Bender how to acquire the property herself; she also filled

out the document (using the name Dorothy Kitchen) and the title policy which were only meant to be samples for Mrs. Bender; she, Mrs. Wheat and Nathan Wells went next door to Moore's house and met a Mrs. Watts but Moore was not there; Mrs. Watts told them the house was in foreclosure; they returned to Mrs. Bender's house and tried to discourage her from buying the property; later Mrs. Bender called her and said Mrs. Bowie wanted to sell the house to her; she did not understand so she had Nathan Wells call Mrs. Bowie and talk to her; she told Mrs. Bender about this and Mrs. Bender talked to Wells; Wells then talked to Mrs. Bowie who agreed to sell the second trust deed for $700; Wells called her and told her to tell Mrs. Bender to get a $700 cashier's check which Mrs. Bender did and she (defendant) gave the check to Wells who took care of it; she had nothing more to do with the transaction; she started studying real estate in 1961 and was still studying in 1965; all documents were just samples. Defendant denied that she at any time went to the bank with Mrs. Bender and that Mrs. Bender ever handed $2,000 to her; she claims the only money she received from Mrs. Bender was $700 for the second trust deed and she gave that to Wells.

In an effort to bring her case within *People v. Ibarra,* 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487], appellant represents to this court that her trial counsel failed to subpoena Nathan Wells and prepare a proper defense and that his knowledge of criminal law was inadequate, thus she was deprived of her constitutional right to be adequately represented by counsel.

■ "To justify relief on the ground that counsel was inadequate, it must appear that the trial was reduced to a farce or sham through the attorney's lack of competence, diligence, or knowledge of law. (*People v. Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) ■ If a crucial defense is withdrawn from the case through the failure of counsel to investigate carefully all defenses of fact and law, the defendant has not received adequate representation. (*People v. Mattson,* 51 Cal.2d 777, 790-791 [336 P.2d 937].)" (*In re Beaty,* 64 Cal.2d 760, 764 [51 Cal.Rptr. 521, 414 P.2d 817].) ■ "Defendant has the burden, moreover, of establishing his allegation of inadequate representation 'not as a matter of speculation but as a demonstrable reality.' (*Adams v. United States* ex rel. *McCann* (1942) 317 U.S. 269, 281 [63 S.Ct. 236, 87 L.Ed. 268, 143 A.L.R. 435]; accord *People v. Robillard* (1960) *supra,* 55 Cal.2d 88, 97 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].)" (*People v. Reeves,* 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35].)

■ Here appellant has failed to sustain her burden; the case simply does not fall within the rule of *People v. Ibarra,* 60 Cal.2d 460 [34 Cal.Rptr.

863, 386 P.2d 487]. A fair reading of the record reflects that defense counsel was diligent and competent throughout the trial of the cause and demonstrated an adequate knowledge of criminal law; that in the light of defendant's version of the transaction (denial of any wrongdoing with Moore or the Benders) he prepared an adequate defense which became inadequate only because the judge refused to believe her; that he made a sustained effort to obtain the appearance of Nathan Wells, although it is fairly apparent from defendant's own testimony that had Wells appeared he would not have been too helpful to the defense; and that under no circumstances here present can it be said that the trial was reduced to a "farce or a sham."

Originally the case was called on May 8, 1968; on May 9 the trial began—Mr. Moore and Mrs. Bender were called for the People, and defense counsel, after extensively cross-examining them, called Mr. Bender, a defense witness, out of order. The court on its own motion continued the cause to May 29, 1968. On May 29 when the People rested, defense counsel advised the court he was having difficulty serving Nathan Wells who was avoiding service; before May 8 defendant advised him that Wells would voluntarily come in and testify for her, and Wells did appear on May 8 and 9; on May 9 he had a subpoena served on Wells; defendant told him that Wells would be in court on May 29 but Wells did not appear and he wanted a bench warrant. However, it developed that the subpoena served on May 9 was for May 9 and Wells was not ordered to return, thus the judge advised him he had no jurisdiction to issue a bench warrant. At this time defense counsel made the statements to which appellant now directs our attention, and which she claims show his lack of knowledge of criminal law: "That I understand. There wasn't ten days notice, is that what you are talking about, your Honor?"; the judge said, "I beg your pardon," whereupon defense counsel continued, "Because the subpoena was not served in a lawful manner?" The court's response was, "He was apparently served after the date the subpoena ordered him to appear."

While the foregoing may reflect some confusion on counsel's part, this appears to be of no consequence because immediately thereafter the cause was continued to July 18 to permit him to try to re-serve Nathan Wells. On July 18, 1968, defense counsel called defendant to the stand advising the court that she would be his only witness because they had "tried to look for other witnesses and could not find them." It is fairly obvious that if defense counsel again sought to have Wells served Wells could not be located; and if in fact he did not try to re-serve Wells, in the exercise of his own best judgment, he may have had good reason for not seeking Wells' presence. (*People* v. *Carreras,* 216 Cal.App.2d 807, 810 [31 Cal.Rptr. 436].) Of greater significance is appellant's failure to demonstrate in what manner Wells' testimony could have helped her. According to the prosecu-

tion witnesses, Wells had nothing to do with the defendant's transactions with them—Moore complained that defendant fraudulently induced him to sign and deliver to her the deed to his property for which he received nothing, also testified he never met Wells, in fact, "never heard of him"; Mrs. Bender complained that she turned $2,000 in cash over to defendant for the deed to Moore's property but said she met Wells only after she had received the deeds from defendant; and Mr. Bender testified he had never met Wells. Even defendant's own testimony fails to indicate that Wells was present when any of her activities, of which Moore and Mrs. Bender complained, took place because she denied she ever knew Moore, entered into any transaction with him or met him, and that she ever took $2,000 from Mrs. Bender or accomplished the transfer of Moore's property to the Benders. The only conflict involving Wells was created by Mrs. Bowie's testimony from which it may be inferred that defendant and Wells gave her the Benders' $700 cashier's check in return for her second deed of trust and defendant did most of the talking, and defendant's testimony that Wells took care of the transaction with Mrs. Bowie and all she did was obtain the $700 check from Mrs. Bender. However, this conflict relates to a matter of no importance and purely collateral to the main issue. ▮ "It is a matter of speculation as to how this witness would have testified and the defendant has the burden of establishing inadequacy, not as a matter of speculation but as a demonstrable reality. [Citations.] ▮ In any event, a failure to call certain witnesses is not grounds for an inadequacy claim. [Citation.]" (*People* v. *Fields,* 271 Cal.App.2d 500, 502 [76 Cal.Rptr. 358].)

As to appellant's present claim that her counsel did not prepare an adequate defense, if she told the truth under oath at the trial she has failed here to suggest what other kind of defense her counsel could have offered. ▮ The fact that the judge rejected her testimony does not render the defense "inadequate" within the meaning of *People* v. *Ibarra,* 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487].

The judgment is affirmed; affirmance of the judgment carries with it affirmance of the sentence.

Thompson, J., and Gustafson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 1, 1970.