Filed 8/28/13  P. v. Marquez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055006 |
| v. | (Super.Ct.No. FSB903287) |
| JESUS PASQUEL MARQUEZ, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Donna G. Garza, Judge.  Affirmed with directions.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, and Peter Quon, Jr., Seth M. Friedman, and Marissa A. Bejarano, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendant was convicted of carjacking, robbery, assaulting a police officer, and driving with disregard for safety while evading a police officer.  The jury also found true allegations that he used a knife and that a principal used a firearm in committing the carjacking and robbery.  The jury further found true gang enhancement allegations as to each crime.

Efran Barajas was the victim of the carjacking and robbery.  He testified for the prosecution at defendant's preliminary hearing.  Shortly afterward, and unbeknownst to the prosecution, he was deported to Mexico.  Over defendant's objection, the court allowed the prosecution to introduce Barajas's preliminary hearing testimony at trial based on the finding that the witness was unavailable and that the prosecution had made reasonable, good faith efforts to secure his appearance at trial.

On appeal, defendant contends the court violated his constitutional rights under the confrontation clause of the Sixth Amendment in allowing Barajas's preliminary hearing testimony at trial.  He also contends the evidence was insufficient to support the gang enhancement findings, the court erred in failing to hold a *Marsden*[1] hearing, the personal use of a firearm enhancement should be stricken, and the punishment imposed for two of the counts should be stayed pursuant to Penal Code section 654.[2]

---

[1]  *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[2]  All further statutory references are to the Penal Code unless otherwise indicated.

We agree with defendant (and the Attorney General) that the firearm enhancement should be stricken and will modify the judgment accordingly. We reject defendant's other arguments and affirm the judgment as modified.

## II. FACTUAL BACKGROUND

A. *August 1, 2009: The Carjacking and Robbery*[3]

On the evening of August 1, 2009, Barajas was sitting inside his 1992 Jeep Cherokee in the parking lot of a drive-through dairy in San Bernardino. The Jeep had Baja California, Mexico, license plates. Barajas was approached by defendant, who claimed to know him. Barajas told defendant he did not know him and did not want to talk to him. Defendant dropped the bicycle and pulled out a knife. Barajas described that knife as "like a kitchen knife, like a steak knife."

Barajas began to roll up his car window. Defendant and an accomplice stuck their hands inside the car to prevent Barajas from closing the window. They tried to pull Barajas out of the car. Barajas moved to the passenger side of the vehicle and exited out the passenger side door. Defendant and his accomplice chased Barajas across the parking lot. One of them pulled on Barajas's back and threw him to the ground. Defendant and his accomplice started hitting Barajas. They took Barajas's keys from his hand, $500 in cash, his cell phone, watch, and a gold chain from around his neck.

---

[3] The facts regarding the carjacking and robbery were adduced primarily through Barajas's preliminary hearing testimony, which was introduced at trial over defendant's objection. Defendant challenges that ruling on appeal. We address that issue in part III.A. below, and conclude that the court did not err in allowing the testimony into evidence.

3

During the attack, defendant's accomplice lifted his shirt to show a gun in his waistband and said, "[d]o you want me to blow you up right now?" or "I will blast you up right now." Defendant then ran away while the accomplice got inside Barajas's car and drove away. Barajas then walked back to the dairy. From there, someone drove him home. Barajas called the police and described the assailants.

San Bernardino Police Officer Patrick Woolweaver responded to the call. Barajas explained to Officer Woolweaver what had happened and gave him a physical description of the men. Barajas said he believed defendant had dropped the steak knife in the parking lot of the dairy during the assault.

Officer Woolweaver went to the dairy and found a silver knife with a black handle in the parking lot. He requested that a forensic specialist come to the scene to properly process the knife. Photographs of the knife were taken and it was dusted for fingerprints; however, no fingerprints were recovered from the knife. Other officers were notified to be on the lookout for Barajas's Jeep.

B. *August 7, 2009: Defendant's Attempt to Evade a Police Officer and Assault Upon the Officer*

In the early morning of August 7, 2009—six days after the carjacking incident— San Bernardino Police Officer Chris Emon was sitting in his patrol car at an intersection when he observed a white Jeep Cherokee pass him. Officer Emon noticed the Jeep bore Baja California, Mexico license plates, which matched the description of a robbery and carjacking alert from a few days prior. Officer Emon began to follow the Jeep and turned

4

on his rooftop police lights.  The Jeep then ran a stop sign and picked up speed from approximately 5 to 10 miles per hour to approximately 50 to 60 miles per hour.  Officer Emon activated his police siren, and the Jeep increased its speed again—to approximately 80 to 90 miles per hour.

The driver of the Jeep then led Officer Emon on a high-speed pursuit through a residential area with speeds reaching 100 miles per hour.  The chase ended in an apartment complex driveway, approximately two to three miles from where it began.  Officer Emon stopped his car approximately 10 feet behind the Jeep.  As he got out of his patrol car, the Jeep reversed and struck the front of the car.

As Officer Emon approached the Jeep, two occupants of the Jeep ran away.  (A third, a female, got out of the Jeep and stood nearby.)  Officer Emon pursued the driver of the Jeep on foot.  At trial, he identified defendant as the driver.

During the chase, Officer Emon fell and injured his face.  When he caught up with defendant, a struggle ensued.  Defendant grabbed Officer Emon's leg and tried to pull him to the ground.  As other officers arrived, defendant was subdued.

Officer Woolweaver (the officer who had investigated the carjacking and robbery) learned that defendant had been apprehended.  He contacted Barajas and brought him to where the Jeep and defendant were located.  Barajas and Officer Woolweaver remained in the patrol car.  Officer Woolweaver shined his lights on defendant.  Defendant was standing approximately 15 feet away from the patrol car.  Barajas indicated that he

5

recognized defendant and said: "Yeah, that's him. That's the subject with the knife that stole my car."

C. *Evidence Related to the Gang Enhancement*

In 2009, San Bernardino County Probation Officer Nathan Scarano was working on a gang task force. In January 2009, Scarano interviewed defendant. Defendant admitted to Scarano that he was from the "Westside Verdugo" gang. His gang moniker was "Shorty." Defendant was wearing blue clothing at the time of his arrest, which is typically associated with Westside Verdugo gang attire. Defendant also had multiple tattoos dedicated to the gang, including a "Verdugo I.E." tattoo across his chest and a "Verdugo" tattoo on his right leg. Scarano filled out a "gang card" regarding defendant based on his interview.[4]

San Bernardino Police Officer Steven Aranda testified as the prosecution's gang expert. According to Officer Aranda, Westside Verdugo is a criminal street gang whose primary activities include homicide, robbery, carjacking, assault with a firearm, sales of narcotics, and vehicle thefts. He opined that defendant is a member of the Westside Verdugo gang.

Officer Aranda explained the concept of "putting in work" for a gang. Gang members put in work for the gang by "committing crimes for the benefit of the gang, and

_____

[4] A "gang card" is used by police to ascertain whether or not a person in custody is affiliated with a particular street gang. Scarano testified that the gang card contains "statements made by the individual [gang member], the time and place in which it occurred, [and] criteria that is met to indicate that the subject is a gang member."

6

for [their] personal benefit to build [their] reputation and show [their] loyalty and dedication to that gang." He explained that Westside Verdugo gang members would be motivated to commit a carjacking to, among other reasons, show other gang members they are willing to commit violent crimes and represent the gang, use the stolen vehicles to commit other crimes, and instill fear of the gang in the community. Similar reasons motivate the gang members' commission of robbery. He said that weapons are used during crimes to, among other reasons, instill fear in the community and among citizens who witness the crime. He further stated that by fleeing from pursuing police officers and assaulting police officers, Westside Verdugo gang members increase their status within the gang and show they have no fear of law enforcement—that no one will "get in their way of doing what they want to do."

In response to hypothetical questions that mirrored the facts in this case, Officer Aranda testified that the hypothetical crimes were committed with the intent to promote, benefit, or further Westside Verdugo. He explained that the carjacking and robbery show that the gang members who committed those crimes have the "mentality . . . to be violent and to commit crimes that would ultimately benefit them individually by obtaining the stolen property and obtaining the vehicle that could be used to assist the gang or gang members in additional crimes." Assault of police officers and evasion of police officers show that gang members are "willing to do whatever [they] can to get away from police" and that the conduct "enhances [their] reputation with the gang." This benefits the gang by showing how members are willing "to do whatever they can [without] fear of the

7

consequences from fleeing from police or committing crimes." Committing the crimes described in the hypothetical questions would also enhance the gang members' status within the gang. Finally, word of mouth in the community regarding the crimes also helps instill fear and intimidation among the citizenry, which benefits the gang by inhibiting cooperation with the police.

## III. ANALYSIS

A. *The Trial Court's Finding That the Prosecution Made Reasonable, Good Faith Efforts to Locate and Present Barajas at Trial*

Defendant contends the trial court erred in allowing the prosecution to use Barajas's preliminary hearing testimony at trial and thereby violated his constitutional right of confrontation. We disagree.

### 1. Background Legal Principles and Standard of Review

The confrontation clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." (U.S. Const., 6th Amend.; see also Cal. Const., art. I, § 15.) The United States Supreme Court "has emphasized that the Confrontation Clause reflects a preference for face-to-face confrontation at trial," and that "'a primary interest secured by [the provision] is the right of cross-examination.'" (*Ohio v. Roberts* (1980) 448 U.S. 56, 63, fn. omitted, abrogated on other grounds in *Crawford v. Washington* (2004) 541 U.S. 36, 60-68.)

"The right of confrontation 'seeks "to ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness, in which [the defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.'" [Citations.]'" (*People v. Herrera* (2010) 49 Cal.4th 613, 620-621; *Mattox v. United States* (1895) 156 U.S. 237, 242-243.) Moreover, the United States Supreme Court has emphasized that "one of the important objects of the right of confrontation was to guarantee that the fact finder had an adequate opportunity to assess the credibility of witnesses." (*Berger v. California* (1969) 393 U.S. 314, 315.)

An accused's right of confrontation is not absolute. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295.) Traditionally, an exception to the confrontation right has been recognized "where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination . . . ." (*Barber v. Page* (1968) 390 U.S. 719, 722.) Therefore, in order for the exception to be applicable, the (1) witness must be unavailable, (2) must have given testimony against the same defendant, and (3) the defendant had the opportunity to cross-examine the witness. If these criteria are met, the unavailable witness's prior testimony may be admitted at trial without violating a defendant's confrontation right. (*People v. Seijas* (2005) 36 Cal.4th 291, 303.)

9

This traditional exception is reflected in Evidence Code section 1291, which provides that "former testimony," such as preliminary hearing testimony, is not made inadmissible by the hearsay rule if "the declarant is unavailable as a witness" and "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a)(2).) Thus, when the requirements of this statue are met, the admission of former testimony in evidence does not violate a defendant's constitutional right of confrontation. (*People v. Friend* (2009) 47 Cal.4th 1*,* 67.)

Here, only the element of unavailability is in question, as there is no dispute that defendant was a party to the action when Barajas gave his preliminary hearing testimony and defendant had the right and opportunity to cross-examine Barajas at that time. Accordingly, the question is whether Barajas was, in fact, unavailable for purposes of the exception to the confrontation clause.

A witness who is absent from trial is not "unavailable" in the constitutional sense unless the prosecution has made a "good faith effort" to obtain the witness's presence at trial. (*Barber v. Page, supra,* 390 U.S. at pp. 724-725.) Defendant contends the prosecution did not put forth a good faith effort to obtain Barajas's testimony at trial. He argues that the prosecution's efforts were not reasonably diligent and, therefore, the trial court erred in finding Barajas unavailable. In particular, defendant argues that the prosecution had numerous avenues by which they could have procured Barajas's

10

testimony at trial and that the prosecution failed to meaningfully explore any of these avenues.

The United States Supreme Court has described the good faith requirement this way: "The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. 'The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." (*Ohio v. Roberts, supra,* 448 U.S. at p. 74.)

The term "[r]easonable diligence . . . '"connotes persevering application, untiring efforts in good earnest, efforts of a substantial character."' [Citation.]" (*People v. Cogswell* (2010) 48 Cal.4th 467, 477.) What constitutes reasonable diligence depends on the facts of each case. (*People v. Sanders* (1995) 11 Cal.4th 475, 523; *People v. Martinez* (2007) 154 Cal.App.4th 314, 328.) Relevant considerations "'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citation.]" (*People v. Herrera. supra,* 49 Cal.4th at p. 622.) When, as here, the absent witness has been deported to another country, courts have also considered whether a treaty exists between the United States and the country to which the witness was deported that provides for the foreign country's

11

aid in compelling the appearance of the witness at trial in the United States (see, e.g., *id.* at p. 629; *People v. Sandoval* (2001) 87 Cal.App.4th 1425, 1438-1443 (*Sandoval*)),[5] the prosecution's willingness to assist the witness in returning voluntarily (see *Sandoval, supra,* at pp. 1441-1442), the prosecution's failure to use judicial remedies to detain the witness in this country prior to deportation (*People v. Roldan* (2012) 205 Cal.App.4th 969, 981-982), and the prosecution's contacts with appropriate federal governmental agencies (*People v. Martinez, supra,* at p. 329).

The prosecution has the burden of proving reasonable diligence and a good faith effort to procure the witness. (*Ohio v. Roberts, supra,* 448 U.S. at p. 74.) We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard and independently review whether the facts demonstrate prosecutorial good faith and due diligence. (*People v. Herrera, supra,* 49 Cal.4th at p. 628.)

---

**5** As the *Sandoval* court discussed, the United States has such a treaty with Mexico. (See Treaty on Cooperation Between the United States of America and the United Mexican States for Mutual Legal Assistance, Dec. 9, 1987, Sen. Treaty Doc. No. 100-13, eff. May 3, 1991, 27 I.L.M. 443 (the Treaty); *Sandoval, supra,* 87 Cal.App.4th at p. 1439.) Defendant requested that we take judicial notice of the Treaty. The Attorney General opposes the request. Under Evidence Code section 459, subdivision (a), we "shall take judicial notice of . . . matter that the trial court was required to notice under Section 451 . . . ." Evidence Code section 451, subdivision (a) mandates that the trial court take judicial notice of the "public statutory law of . . . the United States . . . ." The Treaty is such a law. (See, e.g., *Foster v. Neilson* (1829) 27 U.S. 253, 314 [a treaty is "the law of the land" and "equivalent to an act of the legislature"].) Accordingly, we grant the request for judicial notice.

12

2. Summary of Facts Pertaining to the Prosecution's Diligence in Locating Barajas

Barajas testified at defendant's preliminary hearing on April 29, 2010. Over the next six days, he was taken into the custody of the San Bernardino County Sheriff, released to the custody of the United States Department of Homeland Security, to whom he indicated his desire to return to Mexico, and deported to Mexico.

On May 6, 2010, the day after Barajas was deported, defendant was arraigned. The trial date was initially set for June 14, 2010, and subsequently changed to June 30, 2010.

On May 12, 2010, prosecution investigator Morey Weiss attempted to serve Barajas with a trial subpoena in this case. Weiss went to a location in San Bernardino believed to be Barajas's residence. When he arrived at the residence, Weiss spoke with Manuel Gonzales, an occupant of the home. Gonzales informed Weiss that Barajas had been deported approximately one week prior. Weiss returned to his office and confirmed that Barajas had been deported or released to a government agency.

The next day, Weiss returned to Barajas's last known residence to see if Gonzales had any information about others who may know Barajas and how to contact him. Because Weiss did not speak Spanish, he brought with him a Spanish-speaking investigation technician from his office, Michelle Martinez.

13

When Weiss arrived at the residence, he again spoke with Gonzales, who told Weiss that he knew one of Barajas's cousins, Salvador Alvarez. Gonzales contacted Alvarez, and Alvarez came to the residence.

Martinez (Weiss's assistant) spoke with Alvarez. Alvarez then telephoned Barajas. Alvarez and Barajas spoke in Spanish, which Weiss did not understand. Alvarez handed the telephone to Martinez, who then spoke to Barajas. Weiss and Martinez then spoke. However, because the court sustained defendant's hearsay objections, the contents of that conversation were not admitted into evidence.

Weiss testified that, upon returning to his office, he "made a phone call to the [S]tate [D]epartment from a phone number [he] got from a web page." He called the number, but because it was "just a general information number," Weiss could "not speak to anyone." Weiss used the Internet to find a telephone number for immigration services in Long Beach, California. Weiss spoke to someone and "explained that [he] was attempting to get information regarding an individual who reportedly was deported from the United States." He was told that, in order to obtain such information, he would need to have Barajas's "alien number," which Weiss did not have. He was referred to what Weiss described as the deportation and removal office for immigration services (DRO).[6]

Weiss called the DRO and was again told that he needed to have Barajas's alien number in order to receive any assistance.

---

[6] This is probably a reference to the enforcement and removal operations of the Immigration and Customs Enforcement arm of the United States Department of Homeland Security.

Weiss then called the West Valley Detention Center. This time, he was successful in obtaining Barajas's alien number.

When Weiss called the DRO again and told a DRO representative he had Barajas's alien number, the representative told Weiss that the DRO could not give him any information over the telephone, and that he needed to send a letter. That day, May 13, 2010, Weiss sent a letter to the DRO which stated, in pertinent part: "Our office is requesting certified verification that Mr. Barajas has been deported, and if it becomes necessary, someone who can testify to Mr. Barajas'[s] deportation. Mr. Barajas testified at the preliminary hearing for this case. By showing that Mr. Barajas is unavailable to provide testimony at trial, we will be able to use his testimony from the previous court hearing. [¶] Please contact me so that we can complete any process required, to either produce Mr. Barajas as a witness, or prove his unavailability to the court."

After he sent the letter to the DRO, Weiss began to make inquiries around his office to see if anyone had dealt with a situation involving getting a witness from outside the country. He checked with the child abduction unit of the district attorney's office because people in that unit have experience going outside of the United States to bring abducted children back from other countries. He was referred to Val Jimenez, an investigator with the California Department of Justice.

Weiss contacted Jimenez and, on May 24, 2010, received from him "some sample letters" that needed to be completed so that Jimenez "could go through the appropriate

authorities to have [Barajas] returned to the United States if needed as a witness." Weiss forwarded the letters to the prosecutor.

Weiss also had conversations with his supervisors about how to transport and house Barajas in the event they could secure his return for trial.

Finally, Weiss also learned of a "process called a U visa." (Weiss was not asked about, and did not explain, the nature of a U-visa.)[7] Because the U-visa process required the approval of a supervising district attorney, Weiss forwarded information about the U-visa to his supervisors. Weiss stated that, as of the date of the due diligence hearing, he was still unsure whether the U-visa procedure was a proper avenue to obtain Barajas's testimony.

As of June 29, 2010 (the date of the hearing to determine Barajas's unavailability), Weiss had not received a response to his May 13, 2010, letter to the DRO.

After listening to Weiss's testimony, the trial court determined that the "district attorney's office used reasonable due diligen[ce] efforts in trying to obtain [Barajas's] testimony in this action," and allowed the prosecutor to introduce the preliminary hearing transcripts into evidence at trial.

---

[7] A U-visa is typically used to provide temporary immigration benefits to aliens who are victims of qualifying criminal activity, and to their qualifying family members, as appropriate. (*Catholic Charities CYO v. Chertoff* (N.D. Cal. 2008) 622 F.Supp.2d 865, 871-872 affd. *sub nom. Catholic Charities CYO v. Napolitano* (9th Cir. 2010) 2010 U.S.App. Lexis 4020.)

16

3. Analysis

For the reasons that follow, we agree with the trial court that the prosecution was reasonably diligent in attempting to produce Barajas at trial.

Weiss began his efforts to subpoena Barajas for trial only six days after defendant's arraignment. He attempted to serve a subpoena on Barajas on May 12, 2010, indicating he was unaware of Barajas's deportation until that time. Weiss then spoke with Gonzales, who put him in touch with Alvarez (Barajas's cousin), who contacted Barajas by telephone. Martinez, Weiss's assistant, then spoke with Barajas. Although the record does not indicate what Barajas told Martinez, Weiss's subsequent conduct implies that Barajas was not willing or able to return to the United States at that time—at least not without the permission of the United States government.

Weiss thereafter contacted a federal immigration agency and was referred to the DRO. The DRO would not help him without Barajas's alien number. Weiss obtained that information from the West Valley Detention Center and sent a letter to the DRO as that agency instructed. The DRO never responded to Weiss.

Weiss's diligence is further reflected in his efforts to seek out others in the district attorney's office with experience getting witnesses from abroad, his following up on a referral that led him to contact Jimenez at the California Department of Justice, and conversations with his supervisors about transporting and housing Barajas in the event they could secure Barajas's return.

17

As the trial court noted, there were probably other steps that could have been taken; "there's always one more thing that could have been done."  Weiss could have, for example, followed up with the DRO when his written inquiry went unanswered.  The question, however, is whether the prosecution's efforts were reasonable and made in good faith.  Based on the evidence produced at the hearing, the prosecution's efforts satisfied this test.

Defendant suggests that the prosecution should have made efforts to keep Barajas from being deported.  We disagree.  "The prosecution is not required 'to keep "periodic tabs" on every material witness in a criminal case . . . .' [Citation.]"  (*People v. Wilson* (2005) 36 Cal.4th 309, 342.)  Nor does the prosecution have an affirmative duty to verify a witness's immigration status or to ensure that such status does not change prior to trial.  (*People v. Martinez, supra,* 154 Cal.App.4th at p. 329.)  Barajas's apprehension and deportation appears to have occurred within a period of three days and there is no evidence that the prosecution knew or had any reason to know that Barajas was facing deportation.  Under the circumstances, the prosecution's failure to learn of and stop Barajas's deportation does not reflect a lack of reasonable diligence.

Defendant points out that Weiss could have followed up with others regarding the U-visa procedure.  There is, however, nothing in the record to indicate that the U-visa procedure applied to this case or, if it did, that that process would have or could have secured Barajas's presence at trial.

18

Defendant asserts that "the prosecution [was] aware of where Barajas was." If defendant is referring to the awareness that Barajas was in Mexico, that is probably true. If defendant is referring to knowledge of a more precise location for Barajas, the record does not indicate such knowledge. Nor does the record indicate that Weiss, Martinez, or anyone in the district attorney's office knew Barajas's telephone number or other contact information. Although Martinez spoke with Barajas by telephone, she did so only after Alvarez (Barajas's cousin) called Barajas and handed the telephone to her.

Defendant also suggests that Weiss should have personally gone to Mexico to get Barajas. Barajas had been deported for being in the United States illegally. Even if Weiss knew where Barajas was residing in Mexico, there is no basis for believing he could have brought Barajas back into the United States without the federal government's consent.

Defendant points to the fact that Barajas submitted a written victim impact statement in connection with defendant's sentencing. The statement was submitted to the court in October 2010, approximately four months after the hearing to determine his unavailability and the beginning of trial. Although this indicates that the prosecution may have been in contact with Barajas around the time the statement was submitted, it is not evidence of such contact at the time of the hearing. Moreover, Barajas's willingness and ability to send a written statement from Mexico is not evidence of his willingness or ability to physically return to the United States.

19

Defendant relies heavily on *Sandoval, supra*, 87 Cal.App.4th 1425. In *Sandoval*, the witness (Zavala) was in police custody on drug charges when the defendant's preliminary hearing took place. (*Id.* at p. 1432.) In return for Zavala's testimony, the drug charges against him were dropped. (*Ibid.*) He was thereafter deported to Mexico. (*Ibid.*) Prior to the defendant's trial, the court held a hearing to determine if Zavala was unavailable. At the hearing, a prosecution investigator testified that Zavala was in Mexico, that he contacted Zavala by telephone, and that Zavala was willing to testify if he could get a passport and visa to enter the United States legally. (*Ibid.*) Zavala said he needed $100 to make the trip to an American consulate to apply for the visa. (*Ibid.*) The prosecution decided not to assist Zavala and "did nothing more to secure his attendance at the trial." (*Ibid.*) In short, as the Court of Appeal stated: "[T]he prosecution threw up its hands and asserted Zavala was unavailable simply because he was a foreign citizen residing outside of the United States." (*Id.* at p. 1443.) This alone, the court held, did not constitute the reasonable, good faith effort required to establish unavailability for purposes of the confrontation clause. (*Id.* at pp. 1428, 1443-1444.)

In contrast to the situation in *Sandoval*, the prosecution in the present case is not asserting that Barajas was unavailable merely because he was a Mexican citizen in Mexico. Nor did the prosecution simply "thr[o]w up its hands," but rather, in the relatively short time between the arraignment and the trial, attempted to serve a subpoena on Barajas and locate his whereabouts in Mexico, contacted government agencies in an effort to facilitate Barajas's return to the United States, and communicated with Weiss's

20

supervisors about obtaining transportation and housing for Barajas. Moreover, unlike the situation in *Sandoval*, there is no evidence in the present case that the prosecution was aware of Barajas's location in Mexico, had his telephone number prior to trial, or that Barajas had agreed to testify at trial. *Sandoval* is thus easily distinguishable.

Defendant also contends that "this case is very similar to" *People v. Roldan, supra,* 205 Cal.App.4th 969. It is not. In *Roldan*, the witness, Barrera, was in the process of being deported by the federal government at the time of the preliminary hearing. (*Id.* at p. 976.) Barrera told an investigator for the prosecution that after he was deported he would be willing to return to testify at trial. (*Ibid.*) However, after his deportation, the investigator was unable to locate Barrera. (*Id.* at p. 977.) The trial court allowed the prosecution to use Barrera's preliminary hearing testimony at trial. (*Id.* at p. 978.) The Court of Appeal reversed. The court's analysis and conclusion was based largely upon the fact that the prosecution knew of Barrera's impending deportation. In light of that information, the prosecution could have detained Barrera as a material witness under section 1332, subpoenaed him for trial prior to his deportation, obtained his assurance he would return, given him contact information to stay in touch with authorities in this country, and provided him with information and resources to facilitate his reentry into the United States. (*People v. Roldan, supra,* at pp. 981, 984.) At a minimum, the court added, the prosecution should have notified defense counsel of Barrera's impending deportation so that defense counsel could take actions to make Barrera available at trial. (*Id.* at p. 985.) Here, by contrast, there is no evidence whatsoever that the prosecution

was aware of Barajas's deportation until after it happened. *Roldan* has no application to our facts.

Finally, defendant refers us to the Treaty (see fn. 5), but states only that it "will be useful and necessary to resolution of [defendant's] direct appeal." He offers no explanation as to how the Treaty supports his argument. Indeed, it is unlikely the Treaty would have been helpful in securing Barajas's presence at trial. First, the Treaty does not require the transfer to the United States of persons not in custody in Mexico; at most, the Mexican government must "invite" Barajas to appear before an "appropriate authority" of the United States and inform him of the extent to which his expenses would be paid. (Treaty, art. 9.) Second, a request that the Mexican government make such an invitation should include information about Barajas's location. (Treaty, art. 4, § 3.) Unless and until Barajas was found, the Treaty would appear to be ineffectual. As discussed above, there is no evidence the prosecution was aware of Barajas's whereabouts and, therefore, no reason to pursue the procedures available under the Treaty.

We therefore conclude the court did not err in allowing the prosecution to introduce Barajas's preliminary hearing testimony at trial

B. *Sufficiency of the Evidence to Support the Gang Enhancement Findings*

As to each count of which defendant was convicted, the jury found true allegations that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further, or assist in any

22

criminal conduct by gang members. Defendant contends there was insufficient evidence to support these findings. We disagree.

On review of the sufficiency of evidence to support a criminal conviction, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Osband* (1996) 13 Cal.4th 622, 690.) "'"[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" (*People v. Welch* (1999) 20 Cal.4th 701, 758; *People v. Osband, supra,* at p. 690.) The substantial evidence standard of review applies to sufficiency of the evidence claims regarding section 186.22 gang enhancements. (*People v. Augborne* (2002) 104 Cal.App.4th 362, 371; *People v. Ortiz* (1997) 57 Cal.App.4th 480, 484.)

Section 186.22, subdivision (b)(1), provides for a sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." The "Legislature included the requirement that the crime to be enhanced be committed for the benefit of, at the direction of, or in association with a criminal street gang to make it 'clear that a criminal

23

offense is subject to increased punishment . . . only if the crime is "gang related."'

[Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

The elements of the gang enhancement may be proven by expert testimony.

(*People v. Williams* (2009) 170 Cal.App.4th 587, 621 [Fourth Dist., Div. Two]; *People v.*

*Martinez* (2008) 158 Cal.App.4th 1324, 1332.)  In particular, "'[e]xpert opinion that

particular criminal conduct benefited a gang' is not only permissible but can be sufficient

to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement."

(*People v. Vang* (2011) 52 Cal.4th 1038, 1048, citing *People v. Albillar, supra,* 51

Cal.4th at p. 63.)

Here, there was evidence that defendant was a member of the Westside Verdugo

criminal street gang, whose primary activities included homicide, robbery, carjacking,

assault with a firearm, sales of narcotics, and vehicle thefts.  Indeed, another Westside

Verdugo gang member had previously committed a carjacking at the same location where

Barajas was robbed and carjacked.  Officer Aranda explained how the commission of

carjackings and robberies by Westside Verdugo gang members will allow the gang to use

the stolen vehicle and property for further criminal activity and will instill fear of the

gang in the community.  The use of weapons during crimes increases such fear.  He

further testified that a hypothetical carjacking and robbery that mirrored the facts in this

case would benefit the gang because the gang members who commit such crimes show

they have the "mentality . . . to be violent" and can use the stolen vehicle and property "to

24

assist the gang or gang members in additional crimes." The revenue obtained from the robbery could also "benefit the gang . . . ."

Based on such evidence, a reasonable jury could conclude that defendant—a member of a gang that commits carjackings and robberies—committed the carjacking and robbery of Barajas to obtain the vehicle and property for the gang's use, as well as to instill fear of the gang in the community. Such evidence is sufficient to support the jury's findings that defendant committed these crimes for the benefit of the gang and with the specific intent to promote, further, or assist in criminal conduct by gang members.

There is also substantial evidence to support the gang enhancements regarding the crimes of assaulting a police officer and evading a police officer with willful disregard for the safety of others. Officer Aranda testified that a gang member's assault and evasion of a police officer enhances the gang member's reputation by showing how he or she is willing to do whatever it takes to get away from police. Word of mouth regarding such actions in the community spreads fear among the citizenry of retaliation, which benefits the gang by inhibiting cooperation with the police. Based on such evidence, the jury could reasonably conclude that defendant committed the assault and evasion of the police for the benefit of, and with the intent to benefit and promote criminal activity by gang members.

Defendant belittles Officer Aranda's testimony as "generic" and argues that "it was just as likely that [defendant] committed . . . the robbery and carjacking for personal reasons not intended to promote the gang." Such arguments, however, are for the jury.

25

In reviewing the record to determine whether there is substantial evidence to support the jury's findings, we do not reweigh the evidence or reevaluate a witness's credibility. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) Nor can we reverse a jury's finding that is supported by substantial evidence merely because the evidence could also support a contrary finding. (*Ibid.*) We therefore reject defendant's arguments and affirm the true findings on the gang enhancements.

C. *Court's Failure to Hold a Marsden Hearing*

At defendant's sentencing hearing, the following colloquy occurred:

"THE COURT:  . . . It is the Court's intention to proceed with sentencing in this matter, [u]nless [defendant] has anything to say to the Court?

"[DEFENSE COUNSEL]:  Sir, [defendant], you may speak, if you wish to.

"THE DEFENDANT:  I wanted to tell my attorney if there is any way I can find for ineffective assistance of counsel.

"THE COURT:  This is not the time.  And the Court has already heard motions for new trial and everything else.  I think we are going to proceed at this point with sentencing.  And any issue with respect to any other issue, the Court is not going to hear it at this time.  We are already almost ten months post hearing."

Defendant contends his statement triggered the court's duty to hold a *Marsden* hearing.  We disagree.

An indigent criminal defendant is entitled to competent representation, and if the defendant cannot afford to hire an attorney one must be appointed for him or her.

26

(*Gideon v. Wainwright* (1963) 372 U.S. 335, 343-345; *Marsden, supra,* 2 Cal.3d at p. 123; *People v. Crandell* (1988) 46 Cal.3d 833, 853.)  Although there is generally no right to more than one appointed attorney, a defendant may request that his or her appointed counsel be discharged and substitute counsel appointed.  (*Marsden, supra,* at p. 123.)  When such a request or motion is based on alleged ineffectiveness of counsel, the trial court has a duty to give the defendant an opportunity to explain the basis for the claim.  (*Id.* at p. 124.)  However, this duty does not arise until "the defendant in some manner moves to discharge his current counsel."  (*People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. omitted.)  Although a formal motion is not required, there must be "'at least some clear indication by [the] defendant,' either personally or through his current counsel, that [the] defendant 'wants a substitute attorney.'  [Citation.]"  (*People v. Sanchez* (2011) 53 Cal.4th 80, 89-90; see also *People v. Martinez* (2009) 47 Cal.4th 399, 418.)

In the present case, defendant did not assert that his counsel was ineffective or indicate he wanted a substitute attorney.  He said:  "I wanted to tell my attorney if there is any way I can find for ineffective assistance of counsel."  It appears defendant wanted to "tell"—or perhaps ask or speak with—his attorney about the possibility that he can "find"—or perhaps claim—ineffective assistance of counsel.  He stated he wanted to speak to "*my* attorney," not another or different attorney.  His comment does not suggest he is unhappy with his attorney or that he actually has any reason for believing his attorney was ineffective.  Rather, he indicates his desire for his current attorney's advice as to whether the attorney knows if "there is any way" he can find (or claim) ineffective

27

assistance.  Therefore, because defendant gave no indication he wished substitute counsel, the trial court had no duty to conduct a *Marsden* inquiry.[8]

Defendant contends that this case "presents a scenario very similar to that discussed in" *People v. Stewart* (1985) 171 Cal.App.3d 388 (*Stewart*) and *People v. Smith* (1993) 6 Cal.4th 684 (*Smith*).  In *Stewart*, the defendant filed a motion for new trial based on, among other grounds, the ineffective assistance of the defendant's counsel. (*Stewart, supra,* at p. 393.)  At the hearing on the new trial motion, the defendant's attorney argued that the court should appoint a new attorney for the defendant.  (*Ibid.*) The court conducted an in camera hearing with the defendant and his counsel where the defendant expressed his reasons why he believed his counsel was ineffective.  (*Id.* at p. 394.)  One reason was counsel's failure to call two particular witnesses.  (*Ibid.*)  The trial court denied the motion for new trial.  (*Ibid.*)  The Court of Appeal reversed, stating that the "trial court did not inquire into the substance of the [two] witnesses' expected testimony, but instead denied the motion without endeavoring to learn whether the testimony might have been material or even crucial and without appointing new counsel to assist the court in this regard."  (*Id.* at p. 398.)

In *Smith*, the defendant accepted a plea offer.  (*Smith, supra,* 6 Cal.4th at p. 687.) On the date set for sentencing, he "filed a motion for substitution of counsel 'due to

---

**8** On appeal, defendant asserts that he made a "request to 'find for ineffective assistance of counsel.'"  Defendant's creative editing suggests he had requested that the court find he had received ineffective assistance.  Although defendant's actual statement is somewhat vague and ambiguous, defendant's construction is not a reasonable interpretation of the statement.

28

inadequate representation of counsel,' citing [*Marsden*]." (*Id.* at p. 688.)  After an in camera hearing with the defendant and his attorney, the court denied the motion. (*Id.* at pp. 688-689.)  The Supreme Court held there was no error: "The court fully allowed [the] defendant to state his complaints, then carefully inquired into them." (*Id.* at p. 696.)

In both *Smith* and *Stewart*, there was no question that the defendants indicated a desire for substitute counsel and thereby triggered the duty to hold a *Marsden* hearing.  In *Smith*, the defendant filed a written motion for substitution of counsel citing *Marsden*. (*Smith, supra,* 6 Cal.4th at p. 688.)  In *Stewart*, the defendant filed a motion for new trial based on ineffective assistance of his counsel and defense counsel argued for appointment of new counsel. (*Stewart, supra,* 171 Cal.App.3d at p. 393.)  In both cases, an in camera *Marsden* hearing was held.  In *Smith*, the court's inquiry was sufficient; in *Stewart*, it was not.  Neither case is apposite here because, as set forth above, defendant did not indicate that he wanted substitute counsel.  Therefore, unlike the situations in *Smith* and *Stewart*, the duty to hold a *Marsden* hearing never arose.

D.  *Section 12022.53 Enhancement*

As to count 1, carjacking, the court sentenced defendant to a term of 15 years to life based on the jury's gang enhancement finding under section 186.22, subdivision (b)(4)(B).  The court added 10 years to that sentence based on section 12022.53, subdivision (b), and the jury's finding that a principal personally used a firearm in committing the carjacking.  Defendant contends the court should not have imposed the 10-year enhancement and that it must be stricken.  The Attorney General agrees.

29

Section 186.22, subdivision (b)(4), provides, in part: "Any person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of: [¶] . . . [¶] (B) Imprisonment in the state prison for 15 years, if the felony is . . . carjacking, as defined in Section 215 . . . ."

Section 12022.53, subdivision (b), provides, in part: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years." Subdivision (e) of that section provides that the enhancement applies to any person who is a principal in the commission of an offense if the person violated section 186.22, subdivision (b) and any principal in the offense personally used a firearm. However, an "enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person *personally* used or *personally* discharged a firearm in the commission of the offense." (§ 12022.53, subd. (e)(2), italics added.) Finally, section 12022.53, subdivision (j), provides, in part: "When an enhancement specified in this section has been admitted or found to be true, the court shall impose punishment for that enhancement pursuant to this section rather than

30

imposing punishment authorized under any other provision of law, unless another enhancement provides for a greater penalty or a longer term of imprisonment."

In *People v. Brookfield* (2009) 47 Cal.4th 583, our state Supreme Court considered the interplay between the gang enhancement (§ 186.22) and the enhancement for personal use of a firearm (§ 12022.53). The court explained that a defendant who commits a gang-related offense specified in section 12022.53 in which a principal, but not the defendant, personally used or discharged a firearm is "subject to additional punishment under *either* section 12022.53 *or* the gang-related sentence increases under section 186.22, but not *both*." (*People v. Brookfield, supra,* at pp. 593-594.) "Either," however, does not mean the court has discretion to impose one enhancement or the other: the trial court must impose the greater penalty (i.e., the life term under § 186.22, subd. (b)(4)), rather than the lesser, 10-year sentence under section 12022.53. (*People v. Brookfield, supra,* at p. 596.) When the court errs by imposing both penalties, the proper remedy is to strike the 10-year sentence enhancement under section 12022.53. (*People v. Brookfield, supra,* at p. 597.)

As both sides agree, *Brookfield* is controlling. Here, defendant was sentenced to a term of 15 years to life based upon the carjacking and the gang enhancement pursuant to section 186.22, subdivision (b)(4)(B). He used a knife (not a gun) in the carjacking; his accomplice used a gun. Under *Brookfield*, defendant cannot be sentenced under *both* section 186.22, subdivision (b)(4)(B) and section 12022.53, subdivision (b). The court's imposition of both sentences in this case is error. The 10-year enhancement under section 12022.53, subdivision (b) must be stricken.

E.  *Section 654 Issues*

In pronouncing sentence, the court did not apply section 654 to stay the sentence on any count.  Defendant contends this was error and the punishments for the convictions for robbery (count 2) and evading an officer (count 4) should have been stayed.  He argues that the robbery was incidental to the carjacking (for which he was punished under count 1) and his conduct in assaulting and evading the police officer under counts 3 and 4 were part of an indivisible course of conduct.  Because substantial evidence supports the court's implied findings that defendant harbored separate intents and objectives in committing his crimes, we find no error.

1.  Background Principles

Section 654, subdivision (a), provides, in part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  The statute precludes multiple punishment when a single act or an indivisible course of conduct violates two or more criminal statutes.  (*People v. Hester* (2000) 22 Cal.4th 290, 294; *People v. Deloza* (1998) 18 Cal.4th 585, 591.)

Whether multiple crimes were committed as part of an indivisible course of conduct depends upon the defendant's intent and objective.  (*People v. Harrison* (1989) 48 Cal.3d 321, 335; *In re Adams* (1975) 14 Cal.3d 629, 634.)  "'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but

32

not for more than one.' [Citation.]" (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) "On the other hand, if the evidence discloses that a defendant entertained 'multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citations.]" (*In re Adams, supra,* at p. 634.)

The defendant's intent and objective are factual questions for the trial court. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) The court's finding, whether express or implied, will be upheld on appeal if supported by substantial evidence. (*People v. Osband, supra,* 13 Cal.4th at pp. 730-731; *People v. Powell* (2011) 194 Cal.App.4th 1268, 1296.) We review the trial court's determination in the light most favorable to the defendant, and we presume the existence of every fact the trial court could have reasonably deduced from the evidence. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

2. Failure to Stay Punishment for Robbery (Count 2)

There is substantial evidence to support the court's implied finding that defendant harbored a separate intent and objective with respect to the carjacking and robbery. While Barajas was sitting in his Jeep, defendant and an accomplice approached him. When defendant pulled out a knife, Barajas attempted to close his car window. The assailants reached inside and tried to pull Barajas out of the car. There was no evidence that either assailant demanded any property from Barajas. Barajas then got out on the

passenger side, taking his keys with him.  Defendant and the accomplice ran after him, caught him, and hit him.  They then took his car keys, money, cell phone, watch, and a chain from around his neck.  The accomplice then drove away in Barajas's Jeep.

The fact that defendant and his accomplice attempted to pull Barajas out of his Jeep without demanding any other property indicates an intent and objective to carjack the Jeep.  The trial court could have reasonably concluded that if they had been successful in pulling Barajas out of the Jeep they (or at least defendant's accomplice) would have immediately fled in the Jeep without taking any other property from Barajas.  Although defendant and his accomplice subsequently took Barajas's money and other property, the court could reasonably have found that defendant did not form the intent to do so until after he chased after and caught up to Barajas.  Therefore, viewing the evidence and the reasonable inferences deducible therefrom in a light favorable to the court's determination, the evidence is sufficient to support the finding that defendant harbored separate intents and objectives for purposes of section 654.

Defendant relies on *People v. Dominguez* (1995) 38 Cal.App.4th 410.  In that case, the defendant entered the victim's van, placed a "cold and metallic object against his neck," and said, """Give me everything you have. . . ."""  (*Id.* at p. 414.)  The victim gave the defendant two rings and a chain, then ran away.  (*Id.* at pp. 414-415.)  The van was recovered some distance away.  (*Id.* at p. 415.)  The defendant was convicted of carjacking and robbery.  (*Id.* at p. 414.)  Significantly, the prosecutor conceded the applicability of section 654 to the carjacking and robbery convictions and the trial court

34

expressly found that "section 654 required no punishment for the robbery in addition to the carjacking." (*Id.* at pp. 419-420.) The question for the Court of Appeal was whether that finding was supported by substantial evidence. (*Id.* at p. 420.) The court concluded that it was because the carjacking and the robbery in that case "constituted 'the same act.'" (*Ibid.*)

There are two problems with defendant's reliance on *Dominquez.* First, even if the facts in *Dominguez* were identical to the facts in the present case, the court was faced with an issue different from the issue we face. The *Dominquez* court considered whether there was substantial evidence to support the trial court's finding that section 654 *applied*; we, however, must consider whether there is substantial evidence to support the court's finding that section 654 does *not* apply. The fact that evidence is sufficient to support the court's finding that section 654 applies does not preclude the possibility that the evidence is also sufficient to support a contrary finding. (See, e.g., *People v. Robillard* (1960) 55 Cal.2d 88, 93 ["the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment"], overruled on another point in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2, 648-649.) The holding of *Dominguez*, therefore, provides little guidance on the question we face.

Second, *Dominguez* is factually distinguishable. In that case, the defendant entered the victim's van and immediately told him to give the defendant everything he had. The victim then "handed over his jewelry and van . . . ." (*People v. Dominguez,*

35

*supra,* 38 Cal.App.4th at p. 420.) The carjacking and the robbery of the jewelry thus "constituted 'the same act.'" (*Ibid.*) Here, by contrast, defendant first attempted to pull Barajas from the Jeep without any demand to give him any property; he thereafter took Barajas's money and personal property only after chasing him down. Unlike the facts in *Dominguez,* these facts reasonably support an inference that defendant did not form the intent to rob Barajas of his money and other items until after he began to chase him. *Dominguez,* therefore, does not help defendant in this case.

3. Failure to Stay Punishment for Evading Police Officer (Count 4)

Defendant contends the punishment for his assault on Officer Emon should be stayed under section 654 because his driving without regard for safety while evading a police officer was indivisible from his assault on the police officer. As with the issue concerning the carjacking and robbery counts, our resolution of this issue depends upon our deferential standard of review concerning the court's implied factual finding.

Count 4—driving a motor vehicle with willful disregard for the safety of persons or property while eluding a pursuing police officer—is supported by evidence that defendant, driving Barajas's Jeep in a high-speed chase through residential streets, attempted to evade the pursuing officer. The chase ended when defendant drove into an apartment complex. The assault charge was based upon evidence that, as Officer Emon got out of his car to approach the Jeep in the apartment complex driveway, the Jeep reversed and hit the officer's patrol car.

36

Defendant argues that he used the Jeep to hit the patrol car with the same intent and objective he harbored during his reckless driving—to avoid or delay his apprehension. The Attorney General, on the other hand, contends that defendant's conduct had distinct intents and objectives: (1) defendant drove the Jeep as he did to avoid apprehension; and (2) after coming to a stop in the apartment complex, defendant drove the Jeep in reverse to assault Officer Emon. The Attorney General argues that if defendant had maintained the initial objective to evade capture, he would have got out of the Jeep and fled on foot as soon as he stopped the Jeep in the apartment complex driveway. However, instead of immediately fleeing, defendant remained in the Jeep and used it to hit the patrol car when Officer Emon was standing just outside the car's door. He may have done this not to avoid or delay apprehension but, as Officer Aranda opined, to show that he had no fear of law enforcement and thereby increase his status within the gang.

Both interpretations of the facts, we believe, can be reasonably inferred from the evidence—the act of driving the Jeep in reverse and hitting Officer Emon's patrol car could reasonably have been viewed by the trial court as either furthering defendant's efforts to avoid apprehension or as an act designed to assault the officer and thereby enhance defendant's status in his gang. Because the court implicitly found defendant harbored a separate intent and objective when he hit Officer Emon's patrol car and we must affirm the court's determination if its finding is supported by substantial evidence, we must affirm the court's determination in this case.

## IV.  DISPOSITION

The judgment is modified such that the 10-year firearm enhancement under section 12022.53, subdivision (b), is stricken from the sentence on count 1.  As modified, the judgment is affirmed.  The trial court is directed to prepare a minute order and an amended abstract of judgment reflecting the modification.  The trial court is further directed to forward a copy of the minute order reflecting the modification of the judgment and the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____
                                                                    J.

We concur:

RAMIREZ _____
                        P. J.

MILLER _____
                        J.